IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

No. 20-7008

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee*,

**v.**

**HENRI PIETTE,**
*Defendant/Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
THE HONORABLE RONALD A. WHITE, UNITED STATES DISTRICT JUDGE
CASE NO. CR-17-79-RAW

BRIEF OF PLAINTIFF/APPELLEE

ORAL ARGUMENT IS REQUESTED

CHRISTOPHER J. WILSON
Acting United States Attorney

Linda A. Epperley, Okla. Bar No. 12057
Sarah McAmis, Okla. Bar No. 15903
Assistant United States Attorneys
520 Denison Avenue
Muskogee, Oklahoma  74401
Telephone: (918) 684-5100
Facsimile: (918) 684-5150
linda.epperley@usdoj.gov
sarah.mcamis@usdoj.gov

*Attorneys for Plaintiff/Appellee*

March 16, 2021

# **TABLE OF CONTENTS**

Table of Authorities ..................................................................iv-viii

Prior or Related Appeals ...................................................................1

Statement of Jurisdiction..................................................................1

Statement of Issue Presented for Review .................................................2

Statement of the Case........................................................................2

Statement of the Facts ......................................................................4

 *1. Defendant focuses on the McGinnis family in Missouri*......................5

 *2. Defendant kidnaps Rosalynn in Oklahoma after Gayla and her children escape from his violent household*.............................................7

 *3. Defendant's life-on-the-run leans to increased violence and isolation for Rosalynn*.................................................................................8

 *4. In Mexico, Defendant impose cult-like control over the family while Rosalynn bears his nine children*.........................................10

 *5. Rosalynn successfully escapes with her children in 2016*...................12

Summary of the Argument.....................................................................13

Argument and Authorities

I.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE THAT DEFENDANT MOLESTED TWO OF HIS DAUGHTERS, IN ADDITION TO THE ONE NEIGHBORHOOD GIRL, AND THE RECORD ON APPEAL IS SUFFICIENT TO SUPPOR THE DISTRICT COURT'S RULING. .........................................................15

 **A.  Standard of Review** ................................................................15

 **B.  Procedural Background**........................................................16

i

**C.** **Discussion** ................................................................................19

    *1.* *The sexual abuse of Defendant's children was res gestae of the charged crimes* ................................................................................19

    *2.* *The sexual abuse of Defendant's own daughters was admissible under FRE 404(b) as proof of his motive and plan* ....................................……23

        *a.* The evidence was offered for the proper purpose……………..……23

        *b.* The evidence was relevant…………………………………..…….24

        *c.* The probative value of the evidence was not substantially outweighed by its potential for unfair prejudice……………...……24

        *d.* The Court repeatedly gave cautionary, limiting instructions to the jury……………………………………………………..…….26

    *3.* *Evidence of the sexual abuse that occurred before Defendant met Rosalynn was admissible pursuant to Fed. Rule Evid. 414* ..................26

II. THE DISTRICT COURT CORRECTLY DENIED DEFENDANT'S MOTION TO DISMISS THE § 2423(B) CHARGE ON STATUTE OF LIMIATIONS GROUNDS.................................................................32

**A.** **Standard of Review** ..................................................................32

**B**. **Procedural Background**..........................................................32

**C.** **Discussion**…………………………………………………..…….33

    *1.* *Extensions of the applicable Statute of Limitations* ..............................33

    *2.* *Miller and Gentile do not support reversal based on retroactivity*…………………………………………………..…….37

III. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY REGARDING A SPECIAL INTERROGATORY NEEDED TO RULE ON DEFENDANT'S AFFIRMATIVE DEFENSE TO THE KIDNAPPING COUNT. ..................................................................40

    **A**. **Standard of Review** ...................................................40

    **B**. **Discussion** ...............................................................40

IV. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING DEFENDANT HAD NOT MADE A CLEAR UNEQUIVOCAL REQUEST FOR SELF-REPRESENTATION AT SENTENCING. ................43

    **A**. **Standard of Review** ...................................................43

    **B**. **Discussion** ...............................................................44

Conclusion ................................................................................46

Statement Regarding Oral Argument ......................................46

Certificate of Word Count Compliance ...................................47

Certificate of Digital Submission............................................48

Certificate of ECF Filing & Delivery .....................................48

# TABLE OF AUTHORITIES

## Cases

*Boyle v. United States*,
556 U.S. 938 (2009)................................................................44

*In re Winship*,
397 U.S. 358 (1970)................................................................42

*Smith v. United States,*
—— U.S. ——, 133 S.Ct. 714 (2013)....................................42

*Stonger* v. *California*,
539 U.S. 607 (2003)................................................................33

*United State v. Batton*,
602 F.3d 1191 (10th Cir. 2010) ........................................ 15, 16

*United States v. Batton*,
602 F.3d 1191 (10th Cir. 2010) .............................................31

*United States v. Benally*,
500 F.3d 1085 (10th Cir. 2007) ........................................ 28, 29

*United States v. Burgess*,
576 F.3d 1078 (10th Cir. 2009) .............................................23

*United States v. Castillo*,
140 F.3d 874 (10th Cir. 1998) ...............................................28

*United States v. Day*,
591 F.2d 861 (D.C. Cir. 1978)...............................................20

*United States v. Enjady,*
134 F.3d 1427 (10th Cir. 1998) ........................................ 16, 28

*United States v. Figueroa*,
618 F.2d 934 (2nd Cir. 1980)................................................21

*United States v. Ford*,
613 F.3d 1263 (10th Cir. 2010) ..................................................................20

*United States v. Gallo*,
543 F.2d 361 (D.C. Cir. 1976) ....................................................................20

*United States v. Gano*,
560 F.2d 990 (10th Cir. 1997) ....................................................................20

*United States v. Gentile*,
235 F.Supp. 3d 649 (D.N.J. 2017) ...................................................... 33, 39

*United States v. Guardia*,
135 F.3d 1326 (10th Cir. 1998) ..................................................................28

*United States v. Hurst*,
322 F.3d 1256 (10th Cir. 2003) ..................................................................32

*United States v. Johnson*,
42 F.3d 1312 (10th Cir. 1994) ....................................................................20

*United States v. Kimball*,
73 F.3d 269 (10th Cir. 1995) ......................................................................20

*United States v. Koruh*,
2000 U.A. App. LEXIS 13210 (unpublished) ...........................................29

*United States v. Magnan*,
2018 U.S. App. LEXIS 33353 (unpublished)..............................................30

*United States v. McHorse*,
179 F.3d 889 (10th Cir. 1999) ....................................................................28

*United States v. McIntosh*,
514 Fed. Appx. 776 (10th Cir. 2013).........................................................42

*United States v. McRae*,
593 F.2d 700 (5th Cir. 1979) ......................................................................25

*United States v. McVeigh*,
153 F.3d 1166 (10th Cir. 1998) ..............................................................20

*United States v. Meacham*,
115 F.3d 1488 (10th Cir. 1997) ......................................................... 27, 28

*United States v. Mercer*,
653 Fed.Appx. 622 (10th Cir. 2016).................................................. 29, 30

*United States v. Miles*,
572 F.3d 832 (10th Cir. 2009) ..............................................................46

*United States v. Miller*,
2021 WL 311860 (D.Me. Jan. 29, 2021) ...............................................39

*United States v. Miller*,
2021 WL 787133 (D.Me. March 1, 2021) ..............................................39

*United States v. Miller*,
911 F.3d 638 (1st Cir. 2018).............................................................. 33, 38

*United States v. Naranjo*,
710 F.2d 1465 (10th Cir. 1983) .............................................................25

*United States v. Ortiz*,
927 F.3d 868 (5th Cir. 2019) ................................................................43

*United States v. Simpson,*
849 F.3d 1039 (10th Cir. 2017) ........................................................ 44, 46

*United States v. Smith*,
413 F.3d 1253 (10th Cir. 2005) .............................................................44

*United States v. Smith,*
534 F.3d 1211 (10th Cir.2008) .............................................................16

*United States v. Strum*,
673 F.3d 1274 (10th Cir. 2012) .............................................................31

*United States v. Sturm*,
673 F.3d 1274 (10th Cir. 2012) ...............................................................16

*United States v. Tan*,
254 F.3d 1204 (10th Cir. 2001) ...............................................................23

*United States v. Toledo,*
985 F.2d 1462 (10th Cir.1993) ...............................................................41

*United States v. Zamora,*
222 F.3d 756 (10th Cir.2000) ...............................................................23

## **Statutes**

18 U.S.C. § 1201(a)(1)...............................................................2

18 U.S.C. § 2423(b) ...............................................................2, 33

18 U.S.C. § 3229 ...............................................................33

18 U.S.C. § 3231 ...............................................................1

18 U.S.C. § 3283 ...............................................33, 34, 36, 37

18 U.S.C. § 3299 ...............................................................34

18 U.S.C. § 3509(a)(8)...............................................35, 36

18 U.S.C. § 3509(k) ...............................................34, 35

18 U.S.C. § 1201(g) ...............................................................2

28 U.S.C. § 1291 ...............................................................1

## **Other Authorities**

10th Cir. R. 32.1(A) ...............................................................29

Fed. R. Evid. 401 ...............................................................................................24

Fed. R. Evid. 403 .................................................................................... 23, 25

Fed. R. Evid. 404(b)........................................................... 16, 17, 18, 23, 27

Fed. R. Evid. 404(b)(1) ....................................................................................23

Fed. R. Evid. 404(b)(2) ....................................................................................23

Fed. R. Evid. 414 .................................................................................... 18, 26, 27

Fed.R.App.P. 4(b)(1)(A) ....................................................................................1

Pub. L. No. 101-647, 104 Stat 4789 (Nov. 29, 1990).............................34

Pub. L. No. 103-322, § 160001(g), 108 Stat. 1796 (Sept. 13, 1994).......................35

Pub. L. No. 103-322, § 330018, 108 Stat. 1796 (Sept. 13, 1994) ...........................35

Pub. L. No. 108-21, 117 Stat. 650 (Apr. 30, 2003) ...................................36

Pub. L. No. 109-162, 119 Stat. 2960 (Jan. 5, 2006) ......................................... 36, 37

Pub. L. No. 109-248, 120 Stat. 587 (Jul. 27, 2006) .................................34

U.S. Const., Art. I, § 9, cl.3...............................................................................33

U.S.S.G. § 2A4.1(a) ............................................................................................3

U.S.S.G. § 2A4.1(b)(2)(A)..................................................................................3

U.S.S.G. § 2A4.1(b)(3) ........................................................................................3

U.S.S.G. § 2A4.1(b)(4)(A)...................................................................................3

U.S.S.G. § 2A4.1(b)(5) ........................................................................................3

U.S.S.G. Chap. 5, Part A, note 2.......................................................................3

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Pursuant to 18 U.S.C. § 3231, the district court had subject matter jurisdiction over Defendant's criminal charges because he committed his offense within the Eastern District of Oklahoma.  (Vol. I, *Indictment*, ROA at 24-25).[1]

Pursuant to 28 U.S.C. § 1291, courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts of the United States."  The district court sentenced Defendant on February 20, 2020, and entered its written judgment on February 21, 2020.   (Vol. I, *Judgment*, ROA at 418-424). Defendant/Appellant timely filed his notice of appeal on February 20, 2020.  (Vol. I, *Pro Se Notice of Appeal*, ROA at 417).  *See* Fed.R.App.P. 4(b)(1)(A) providing that notice of appeal must be filed within 14 days of the entry of judgment.

---

[1]  References to the record on appeal ("ROA") will be made as follows:

   *Volume I – Pleadings*: by document title, followed by the page number(s) where the cited material appears in the consecutively paginated record, e.g. "Vol. I, *Motion*, ROA at 10."

   *Volume II – Transcripts*: by the hearing name, followed by the page number(s) where the cited material appears in the consecutively paginated transcripts, e.g. "Trial Tr. 7."

   *Volume III –Sealed PSR Materials*: by paragraph number, followed by the page of the sealed record as it appears on the electronic file stamp, e.g. as "Vol. III, *PSR* ¶4, Sealed ROA at 2."

   Defendant/Appellant's brief will be referenced as "*Def. Brf.*"

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

1. Did the district court abuse its discretion in admitting evidence that Defendant molested two of his daughters, in addition to one neighborhood girl, and if so, is record on appeal sufficient to support the district court's ruling?

2. Did the district court correctly deny Defendant's motion to dismiss the § 2423(b) charge on statute of limitations grounds?

3. Did the district court properly instruct the jury regarding a special interrogatory needed to rule on Defendant's affirmative defense to the kidnapping count?

4. Did the district court clearly err in finding Defendant had not made a clear unequivocal request for self-representation at sentencing?

## STATEMENT OF THE CASE

On December 13, 2017, an Eastern District of Oklahoma grand jury returned a two-count Indictment charging Henri Piette ("Defendant") with one count of Kidnapping in violation of 18 U.S.C. §§ 1201(a)(1) & 1201(g), and one count of Travel with Intent to Engage in Sexual Act with a Juvenile in violation of 18 U.S.C. § 2423(b).  (Vol. I, *Indictment*, ROA at 24-25).  On October 17, 2019, after a seven-day trial, a jury found Defendant guilty on both counts.  (Vol. I, *Verdict* ROA at 61388-389).[2]

---

[2] The procedural background for each issue on appeal is set forth in the applicable

The final PSR was filed on January 7, 2020, which calculated Defendant's advisory sentencing range under the 2018 Guidelines. (Vol. III, *PSR* ¶41, Sealed ROA at 61). [3]

| | |
|---|---|
| Base offense level for an offense under 18 U.S.C. §1201(a)(1). *See* U.S.S.G. § 2A4.1(a). (*Id.*, at ¶47, Sealed ROA at 62). | 32 |
| Four-level increase where victim sustained permanent or life-threatening bodily injury. *See* U.S.S.G. § 2A4.1(b)(2)(A). (*Id.*, at ¶48, Sealed ROA at 62). | +4 |
| Two-level increase for use of a dangerous weapon. *See* U.S.S.G. § 2A4.1(b)(3). (*Id.*, at ¶49, Sealed ROA at 62). | +2 |
| Two-level increase where victim held for more than 30 days. *See* U.S.S.G. § 2A4.1(b)(4)(A). (*Id.*, at ¶50, Sealed ROA at 62). | +2 |
| Six-level increase where victim was sexually expoited. *See* U.S.S.G. § 2A4.1(b)(5). (*Id.*, at ¶51, Sealed ROA at 62). | +6 |
| Adjusted Offense Level. (*Id.*, at ¶55, Sealed ROA at 62). | 46 |
| Total Offense Level. (reduced because offense level exceeds 43.) *See* U.S.S.G. Chap. 5, Part A, note 2. (*Id.*, at ¶58, Sealed ROA at 62). | 43 |

Defendant had one criminal history point, resulting in a Category I criminal history. (*Id.*, at ¶63-64, Sealed ROA at 63). An offense level of 43, combined with a Category I criminal history, yielded an advisory guideline imprisonment range of life. (*Id.*, at ¶86, Sealed ROA at 68).

---

argument section of this brief.

[3] After a grouping analysis, the kidnapping count determined the total offense level. (Vol. III, *PSR* ¶43-46, Sealed ROA at 61).

On February 20, 2020, Defendant was sentenced to life imprisonment with five years' supervised release on Count One, plus 360 months' imprisonment with five years' supervised release on Count Two, to run concurrently. (Vol. I, *Minute Sheet – Sentencing*, ROA at 414-416; *Judgment,* ROA at 418-424).

## STATEMENT OF FACTS

On January 31, 1997, Gayla (McGinnis) Piette, reported that her twelve-year-old daughter, Rosalynn McGinnis, had been kidnapped by her step-father, Henri Michelle Piette (Defendant), from a middle school in Poteau, Oklahoma. Gayla,[4] who married Defendant April 2, 1996, at Wagoner, Oklahoma, had recently fled from Defendant due to repeated physical attacks. She was living with Rosalynn and her other children at a domestic violence shelter in Poteau. Gayla told police her daughter left the school with a young man, believed to be Defendant's son, Tobias.

Nineteen years later, on July 28, 2016, Rosalynn appeared with her eight children at the United States Consular General Offices in Nogales, Mexico requesting assistance in escaping from the Defendant. Rosalynn reported being kidnapped from school as a child, then being physically and sexually abused on a daily basis since 1994. Defendant had forced her to change her name, change her appearance, file false police reports, and write letters claiming she was a runaway.

---

[4] To avoid confusion, given the common last names involved and Defendant's eventual marriage to both Rosalynn and her mother, family members are referred to by first names.

4

Defendant used different aliases and they moved frequently. Rosalynn stated the Defendant started sexually molesting her when she was 10 years old in Springfield, Missouri. Over the past nineteen years, Defendant coerced her into marrying him and forced her to give birth to nine of his children. The factual summary set forth below provides a brief overview of the horrific crimes endured by Rosalynn and her children.[5]

### 1. *Defendant focuses on the McGinnis family in Missouri*

As a child, Rosalynn lived in Springfield, Missouri with her father, Michael McGinnis, her mother, Gayla McGinnis, and her siblings - four brothers and one sister. (Trial Tr. 412-413). The McGinnis kids met Defendant's two boys, Tobias and Mikey, and his daughter, Shelly, at a neighborhood park when Rosalynn was nine years old. (Trial Tr. 112-113, 413-414).[6] As the children became play pals, Defendant quickly became close friends with Gayla while her husband was working, urging her to use physical discipline with her children and discussing their common interest in the Mormon religion. (Trial Tr. 414-418, 559). Defendant had a trampoline and other toys otherwise unavailable to the McGinnis family and

---

[5] Some explanation of the facts is necessary to understand Defendant's challenge of "molestation" evidence; however, because Defendant does not challenge the sufficiency of the evidence, this summary does not attempt to cover all the trial evidence.

[6] Defendant was married four times previously, but the record is silent as to how these prior marriages ended or how he ended up with custody of the children. See, Vol. III, *PSR* at ¶75, Sealed ROA at 66).

Defendant hosted sleepovers for the McGinnis children. (Trial Tr. 416-418). Rosalyn was first sexually molested by Defendant at one of these sleepovers at the age of 10 or 11. (Trial Tr. 117-118). He told her not to tell, began to give her extra attention and bought her gifts. (Trial Tr. 122).

Eventually, due to fear of Defendant and his monopolization of Gayla's time, Michael McGinnis left the marriage. (Trial Tr. 418-420). Defendant immediately moved into the paternal role in the combined household. (Trial Tr. 420-421). He began physically and mentally abusing the entire family to the point one of Rosalyn's brothers testified, "I thought I was going to die." (Trial Tr. 421-434). Defendant broke Gayla's jaw, broke her nose, bruised her eyes, and called her derogatory names. (Trial Tr. 433-4435). At some point, Rosalynn's sister told someone that Defendant abused one of the children and the authorities were informed. (Trial Tr. 437-438, 561-564). Although the kids had been coached by Defendant about what to say if ever questioned, Defendant convinced Gayla she would be blamed for the abuse and the family left town immediately. (Trial Tr. 438, 560-561). The family traveled throughout the southwestern United States and parts of Mexico in a van. (Trial Tr. 125). Defendant forced Gayla to beg by holding signs asking for money. (Trial Tr. 434). During this time, several of the other children observed Defendant molesting Rosalynn. (Trial Tr. 125-126, 447, 569, 634).

## 2. _Defendant kidnaps Rosalynn in Oklahoma after Gayla and her children escape from his violent household_

The family eventually moved to a house in Wagoner, Oklahoma where 11-year-old Rosalynn attended fifth grade. (Trial Tr. 132). Defendant had progressed from touching her vagina to penetrating her vagina with his fingers. (Trial Tr. 135). He also gave her alcohol. (Trial Tr. 126). He first raped her in the bottom bunk of a bedroom in the Wagoner house. (Trial Tr. 138). During this time, Defendant severely beat Gayla, who took her children and moved to her grandparent's home in Independence, Missouri. (Trial Tr. 414-143). Defendant went to Independence and brought them back. (Trial Tr. 148).

Upon their return to Wagoner, Defendant made his son Tobias "marry" Defendant and Rosalynn in a secret ceremony. (Trial Tr. 150-152). Defendant told Rosalynn they had to get married because they had "sinned." (Id.). A few days later, he legally married Gayla. The daily sexual assaults continued and Rosalynn felt "hopeless." (Trial Tr. 153). The physical abuse of Gayla accelerated and she knew she needed to escape, but was afraid for her children. (Trial Tr. 435). He beat Gayla to the point of her being comatose at least twice, in front of the children. (Trial Tr. 565).

The family left Wagoner and moved to Tenkiller Lake where they lived in a tent where Gayla finally escaped and relocated to the Poteau, Oklahoma women's shelter with her biological children. (Trial Tr. 155-163, 447-448). Rosalynn was

7

enrolled at a Poteau middle school, while her younger siblings went to a local elementary school. (Trial Tr.164, 447). Defendant and his children remained in the tent at Tenkiller. (Trial Tr. 579-580).

One day, Defendant approached Rosalynn at her school playground, telling her to watch for "signs" because he would be getting the entire family back together. (Trial Tr. 165). The next day she saw a poncho and sombrero on a table outside the school office and she ran outside as she had been instructed by Defendant because she did not want to be left behind when the family moved. (Trial Tr. 166-167). She got into a truck driven by Defendant's son Tobias who took her back to the tent. (Trial Tr. 168, 578-580). Defendant then took her to a Tulsa motel with his children. (Trial Tr. 168-171, 637). She asked where her siblings were, but Defendant told her they did not have time to go get them. (Id.). She asked where her mother was and Defendant said her mother was not coming back. (Id.). Defendant's son Mikey testified that he still recalls the look of "total horror" on 11-year-old Rosalyn's face when Defendant informed them that she was now their new mother. (Trial Tr.638).

### *3.* *Defendant's life on the run leads to increased violence and isolation for Rosalynn*

Defendant used forged documents to enroll Rosalynn and his children in school in Tulsa. (Trial Tr. 175-177). He interrogated them each day after school and told

Rosalynn her mother was dead.[7]  (Id).  Defendant moved them to Oklahoma City after a teacher became suspicious about the family.  (Id).  Rosalynn never attended school again after leaving the 6th grade in Tulsa.  (Trial Tr. 185).

Defendant forced Rosalynn to have sex three times a day.  (Id.).  While in Oklahoma City, Rosalynn became pregnant at 12 years of age and miscarried.  (Trial Tr. 180-181).  He stopped being nice to her, forced her to perform more varied sexual acts, and began beating her.  (Trial Tr.182-183).  The beatings intensified over the years.  (Trial Tr. 182).  He also beat his boys.  (Trial Tr. 183).

For the next few years, Rosalynn endured daily rapes and beatings while Defendant moved them to Colorado, Texas, Montana, Idaho, and Mexico.  (Trial Tr. 186-191).  They made money by begging, stealing and getting help from the LDS church.  (Trial Tr. 187-189, 198-199).  During these years, they frequently returned to Oklahoma to mail letters, which Defendant made Rosalyn write to law enforcement agencies, news stations, and her relatives.  (Trial Tr. 193-194).  The letters, dictated by Defendant, said Rosalynn ran away because Gayla was "crazy" and her family was no good.  (Trial Tr. 194-195).  Defendant wanted it to appear they never left Oklahoma so he could keep federal authorities from joining the search for Rosalynn.  (Trial Tr. 192-193).  To avoid detection, Defendant employed multiple false identities, used forged documents and dyed Rosalynn's hair to change

---

[7] In reality, Gayla searched tirelessly for Rosalynn.  (Trial Tr. 449).

9

her appearance.  (Trial Exhibits 1-5, 8-17).  To insure her compliance, Defendant started giving Rosalynn crack cocaine at 12 years of age.  (Trial Tr. 198).  When she became very sick in Idaho at age 14, Defendant learned Rosalynn was pregnant and moved the family to Mexico to avoid questions about her age.  (Trial Tr. 202-203).

### 4.  *In Mexico, Defendant imposes cult-like control over the family while Rosalynn bears his nine children*

Rosalynn gave birth to E.P., her first child in Mexico when she was 15 years old.  (Trial Tr. 39-40, 203-205).  With the use of a pocketknife, Defendant delivered the baby on the floor of a dirty van outside a clinic after the clinic doctor said Rosalynn was not yet ready to give birth.  (Id).  At the time, the family was living in an abandoned trailer with no electricity and no water.  (Trial Tr. 207).

With occasional trips to the United States, Defendant dragged the family all over Mexico and northern Guatemala for the next 16 years.  (Trial Tr. 54, 216).  They were constantly on the run from cons the Defendant had committed and to avoid anyone still searching for Rosalynn.  (Trial Tr. 216, 603-604).  They usually lived in remote locations in small one-bedroom houses, abandoned trailers, huts or tents.  (Trial Tr. 62, 82, 270, 527, 536).  The children could not read, never went to school, did not understand clocks or calendars, and were not exposed to the internet or television.  (Trial Tr. 518, 280-281).  With rare exceptions, the only outsiders Rosalynn and the children saw were people they encountered while begging or stealing.  (Trial Tr. 76, 628).  Their daily routine included continual hunger and

10

nearly unfathomable violence.  (Trial Tr. 41-81, 208-222, 517-536, 543-551, 588-613).

When asked at trial to describe her scars from Defendant's violent attacks, Rosalynn said:

> I have one on my arm right here. I have 21 -- I think 21 on my top of my head. I have them over both eyebrows. My lips are all scars all over. I have had both arms broken. I mean, I've had both hands broken. I've had this arm broken as you can see. I've been stabbed. I've been shot in the head. I've been shot in the ankle. I still have -- I still have a bullet in my ankle. I've had to have throat surgery to be able to speak correctly -- to be able to speak, period, since I've been back to the United States. When -- I still need knee surgery. I have chronic pain all over my body all the time from the broken bones and the trauma that I've -- physical abuse I've had.

(Trial Tr. 278).

Rosalynn's oldest son, E.P., testified Defendant used a striking variety of weapons on them including pickaxes, rocks and frying pans.  (Trial Tr. 46-47).  He saw his father strike Rosalynn "an immense amount of times. An incountable [sic] amount of times.  Everyday day she would get struck."  (Trial Tr. 48).  E.P. said the children and Rosalynn were "stomped, head pushed into a wall, hair being torn out, being hit with other – sticks and other things."  (Trial Tr. 50).  They were struck with "Two by fours, baseball bats, rocks.  Anything that was in reach.  Bottles with hot sauce in them made out of glass.  Fruits.  Anything."  (Id.).  E.P. had tried to run away several times before he finally escaped at the age of 15.  (Trial Tr. 41, 51).

11

> Q. (BY MR. SNOW) Sure. What happened when Henri Piette found you those times that you ran away?
>
> A. Some of the worse beatings that I'd ever had had in my life. I would get shakes afterwards. I -- he gave me concussions that I never knew were concussions until I got older and I realized that that's what it was. I had gotten hit over the head with frying pans and I'd see static, and then I couldn't talk right for the -- for like a week or so after that. And then general motor movement was bad. He would try to chase me down with a car. He'd thrown me out of a moving vehicle. Thrown machetes at me, rocks. Basically, every time it ended with me having blurry vision, usually being -- having blood running over my face and not -- just not being able to see because my eyes were so swollen and thinking that I was going to die.

(Trial Tr. 51).  Two weeks before E.P. finally left, he heard Defendant tell Rosalynn if she left, he would kill her.  Defendant often tied her to the bed or chained her to a table or a pole.  (Trial Tr. 74).  Defendant bribed the Mexican police and told the family the police would torture them if they tried to run away.  (Trial Tr.100-101).

Rosalyn was afraid to leave because Defendant told her that her family did not want her, that she would be arrested for running away from home, and that he would kill her or kill her children.  (Trial Tr. 219-229).  He made the same threats he had made against her mother.  (Trial Tr. 221).  The few times she attempted to escape ended disastrously.  (Trial Tr. 270-272).

### 5.  *Rosalynn successfully escapes with her children in 2016*

Rosalynn learned she would have to plan any escape carefully because if she were caught again, not only would she be in danger, "the children would pay for

what I tried to do." (Trial Tr. 272). She began hiding small sums of money from Defendant until she had $150 buried near their house. (Trial Tr. 273). She waited until Defendant passed out drunk and then walked with her remaining eight children to the closest road she could find and flagged down a taxi. (Trial Tr. 274). They went to a town 40 miles away and hid until Rosalynn could arrange to pay Mexican authorities to arrest Defendant for domestic violence and send him to an alcohol rehabilitation center. (Trial Tr. 274-276). Rosalynn and the children then traveled to the American Consulate where Rosalynn contacted the National Center for Missing and Exploited Children (NCMEC). (Trial Tr. 276-277). She obtained money from the Mormon Church for bus tickets to the United States border. (Id.). They resettled in Kansas City, Missouri. (Trial Tr. 279-287).

## SUMMARY OF THE ARGUMENT

The overwhelming evidence at trial proved that Rosalynn McGinnis lived a nightmare from the time Henri Piette first molested her in her hometown at the age of nine, until she finally escaped with eight children in tow 23 years later in a foreign country. On appeal, Defendant advances three arguments to attack his conviction and one challenge to his sentencing hearing. None of the arguments merit relief.

Contrary to Defendant's assertions, the trial court was not required to specify one, and only one, evidentiary rule to support the admission of the molestation evidence. The sexual abuse the three girls suffered could be properly admitted under

13

more than one theory. The abuse of his own two daughters tended to prove Defendant's motive and plan under FRE 404(b), but as acts of pure violence the molestation was also res gestae to the charged crimes and the cult-like control Defendant exercised to avoid detection and rule supreme over the family. The molestation of all three girls, but most particularly the non-family member, could be had under FRE 414 to show his propensity for molesting young females in the exact manner he molested Rosalynn. Most importantly, Defendant did not challenge the admission of any evidence of physical violence perpetrated against Rosalynn, her children and her step-brothers.

The district court properly analyzed the 2003 and 2006 amendments to the statute of limitations on the travel charge alleged in count two of the indictment. Defendant's argument is not based on the Ex Post Facto Clause, but attempts to stand solely on whether the amendments were retroactive. The majority of courts have rejected similar arguments and the two cases Defendant asserts rule in his favor offer no real support for his position.

Defendant failed to demonstrate the district court erred in instructing the jury, if and only if they had already found Defendant guilty of the kidnapping charge, to consider whether Defendant proved a fact necessary to his affirmative statute of limitations defense – whether Rosalynn ceased to be continually held against her will prior to the date of her escape.

14

Defendant alleges on appeal that he asked, and should have been allowed, to represent himself at sentencing. First, the transcript indicates Defendant agreed to have his appointed counsel continue representing him through the sentencing until the notice of appeal was filed. Second, the district court, after considering any written request for self-representation that may have been submitted in the context of nearly 600 pages of letters from Defendant to the Court, reached the correct conclusion that Defendant had utterly failed to make a clear and unequivocal request. In an abundance of caution and in compliance with this Circuit's stated presumption against self-representation in order to protect the Sixth Amendment Right to Counsel and promote the orderly administration of justice, the district court properly denied any such request here.

Based on the foregoing, Defendant's conviction and sentence should be affirmed.

## ARGUMENT AND AUTHORITIES

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE THAT DEFENDANT MOLESTED TWO OF HIS DAUGHTERS, IN ADDITION TO ONE NEIGHBORHOOD GIRL, AND THE IS RECORD ON APPEAL IS SUFFICIENT TO SUPPORT THE DISTRICT COURT'S RULING.

### A.    Standard of Review

The Court reviews "legal interpretations of the Federal Rules of Evidence de novo." *United State v. Batton,* 602 F.3d 1191, 1195-96 (10th Cir. 2010). The district

court's evidentiary rulings are reviewed for an abuse of discretion and will not be disturbed "absent a distinct showing [the ruling] was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *Id*. at 1196 (quotation omitted). "Under the applicable standard of review, we may not reverse the district court's evidentiary ruling if 'it falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical.'" *United States v. Sturm*, 673 F.3d 1274, 1286 (10th Cir. 2012), quoting *United States v. Smith,* 534 F.3d 1211, 1218 (10th Cir.2008). This court may uphold a district court's evidentiary rulings on any ground supported by the record. *See United States v. Enjady,* 134 F.3d 1427, 1434. (10th Cir. 1998).

## **B.** **Procedural Background**

Prior to trial, Defendant filed a motion requesting notice of any evidence to be offered under FRE 404(b). (Vol. I, *Def. 404(b) Motion*, ROA at 89-90). The government filed a comprehensive notice detailing 'its intent to offer as part of the res gestae of the crimes charged in the Indictment, evidence of Physical Abuse and Child Sexual Abuse, and in the alternative, pursuant to the Federal Rules of Evidence, Rule 404(b) and 414, evidence of Physical Abuse, Child Sexual Abuse, and Child Molestation." (Vol. I, *Gov. Evid. Notice*, ROA at 100-132). The defense then filed a motion in limine seeking exclusion of any evidence of other molestations. (Vol. I, Def. *Motion in Limine*, ROA at 175-180).

During the Pre-Trial Conference held on May 23, 2019, the district court heard argument about other crimes evidence, including molestation evidence. (Sealed PT Conf. Tr. 17-27). Although the motion in limine addressed only molestation evidence, Defendant's argument also sought to exclude evidence of physical abuse as irrelevant to the crimes charged. (Sealed PT Conf. Tr. 18-19).[8] The Court noted that the questioned evidence would appear to be part of a motive or plan designed "as a way for the defendant to allegedly keep the victim around." (Sealed PT Conf. Tr. 19).

The government argued the physical abuse evidence was res gestae and essential to proving Rosalynn was not a consenting person. (Sealed PT Conf. Tr. 10-22). The prosecutor argued, "you can confine a person not only through fear, but also through violence." (Sealed PT Conf. Tr. 20). As to the molestation evidence of his and Rosalynn's daughters, the government asserted it was also res gestae because he abused those girls in the exact same manner as Rosalynn and perhaps even purposely had children with her in order to have sex with them. (Sealed PT Conf. Tr. 28-29). The prosecutor argued that such evidence regarding his own children was proof of a motive or plan and therefore, also admissible under 404(b). (Sealed PT Conf. Tr. 23-26). The government classified the molestation of any children preceding his first contact with Rosalynn in Springfield, Missouri, as

_____

[8] The admission of physical abuse evidence is not challenged by Defendant on appeal.

17

properly admissible as propensity evidence under FRE 414. (Sealed PT Conf. Tr. 24). The prosecutor acknowledged the rareness of advancing three different justifications for other crimes evidence, but asserted that res gestae, 404(b) and 414 all justified aspects of the evidence because "everything crossed over." (Sealed PT Conf. Tr. 25). The evidence was properly offered for multiple purposes: as part of Defendant's motive and plan, to satisfy an element of the traveling charge, to show propensity and as an intertwined part of the underlying crimes. (Sealed PT Conf. Tr. 25-26).

The district court agreed:

> Well, I think it comes in. And I think it is part of the res gestae, both the physical violence and the sexual encounters for . . . Both because it goes to the issue of consent, and it is inextricably intertwined with the charged crimes.
>
> As far as 404(b), I think, as I've stated earlier, it would come -- 404(b) is a rule of inclusion, not exclusion, and I think it goes to the issues of both motive and plan. I'm not sure about the others. I don't want to throw it in as a catch-all kitchen sink for allowing it in. But as far as motive and plan to establish the so-called cult is there. It works enough under a rule of inclusion, secondly. And, thirdly, under 414, it is propensity evidence as long as -- as well as everything else. And 414 allows evidence like this in a -- in this kind of case typically, and is to be liberally construed.
>
> And so the motion in limine as to the so-called 404(b) evidence will be -- will be denied. Besides that, I still have to do a balancing test under 403. And I believe that the probative value of the evidence is certainly not substantially outweighed by the prejudicial effect. So that adds to my denial of the motion in limine. It is clear that

18

the government's theory of the case is plausible. It's for the jury to decide whether it's persuasive. But it's certainly plausible. And so, under 403, we don't have a reason to keep it out.

(Sealed PT Conf. Tr. 26-27).

During the trial, defense counsel repeatedly objected to "404(b) evidence," as referenced during a bench conference on the second day of the trial"

Before we go on, I've previously ruled that the evidence that Mr. Gotcher has been making a record and objecting to, that what he calls the 404(b) evidence, I don't consider it 404(b) evidence. I consider it res gestae. To the point it could be 404(b) evidence, it has been introduced for a proper purpose, which are the purposes I've previously articulated. It is relevant evidence. Its probative value is not substantially outweighed by the potential for prejudice, and I've given limiting instructions on at least three, maybe four occasions, and of course will continue to do that, or and will certainly give an instruction at the end of the evidence to that effect.

(Trial Tr. at 291). Throughout the trial and in the closing instructions, the district court consistently issued cautionary instructions to limiting the jury in their consideration of such evidence. (Trial Tr. at 56, 147, 228, 234, 391, 422, 509, 5420, 564, 569)(Vol. I, *Instructions*, ROA at 361, 364).

**C.** **Discussion**

*1.* *The sexual abuse of Defendant's children was res gestae of the charged crimes*.

"Evidence of other crimes should not be suppressed when those facts come in as res gestae – as part and parcel of the proof of the offense." *United States v. Ford*,

19

613 F.3d 1263, 1267 (10th Cir. 2010). An uncharged act is properly admitted as res gestae evidence, "if it was inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and incomplete without mention of the prior act." *Id.*, citing *United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir. 1994). Evidence of other crimes should not be suppressed when those facts come in as res gestae – "as part and parcel of the proof of the offense charged in the indictment." *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995), citing *United States v. Gano*, 560 F.2d 990, 993 (10th Cir. 1997); *United States v. McVeigh*, 153 F.3d 1166, 1202 (10th Cir. 1998).

More specifically, evidence is admissible when it provides a context for the crime, is needed for a full presentation of the case, or is appropriate to complete the story of the crime on trial by proving its immediate context or the "res gestae". *Kimball*, 73 F.3d at 272.

Courts recognize that the government shoulders a heavy burden of proving its case beyond a reasonable doubt and that the government is entitled to cumulate evidence. Thus, a court should not unduly restrict the government in the proof of its case. *United States v. Day*, 591 F.2d 861 (D.C. Cir. 1978); *United States v. Gallo*, 543 F.2d 361, 365 (D.C. Cir. 1976). Logically, it is a sound rule that relevant evidence should generally be admitted when the evidence indicates a close

relationship to the crime charged. *United States v. Figueroa*, 618 F.2d 934 (2nd Cir. 1980).

The Defendant repeatedly and for years sexually abused the victim. He had children with the victim, and then he sexually abused his daughters in the same manner. The Defendant forced the victim and the children to make signs and beg for money. Whatever money they earned, the Defendant took and spent on drugs and alcohol. He used drugs with the victim and he quoted verses from the Bible to her and to the children. The Defendant isolated the family by moving frequently. He would go by different names and assigned different names to the victim. The Defendant would physically beat the children and the victim. The Defendant's benefit, one that he maintained for a better part of 20 years, was to sexually abuse the victim starting when she was a child, have children with her so he could in turn sexually abuse those children, and have the entire family beg for money for, and turn it over to him. The Defendant used physical and sexual abuse to maintain control over the entire family.

First, sexual violence against underage girls is not only a sexual act. It is an act of violence and control. For Defendant, sexually molesting his daughters may have satisfied his perverse desires, but it also was another effective weapon in his arsenal for insuring compliance within his family. To the extent that the sexual molestation of his young girls can be viewed as an act of physical violence, it was

part and parcel of his scheme to maintain control of his family and enforce his rules of begging, service and secrecy.

Second, even if Rosalynn was not aware of the details of the sexual abuse at the time, Defendant's actions satisfied his twisted need for young female girls without his having to risk apprehension by going outside the immediate family. Procuring his own victim-factory by taking Rosalynn to Mexico may seem outlandish, but this is no ordinary Defendant. The evidence certainly supported such an argument and the jury could consider such evidence as meeting an element of the travel count.

Moreover, Rosalynn had to be aware of him possibly abusing her daughters. Her siblings had knowledge of her abuse at Defendant's hand and her children observed Defendant's sexual acts with the two daughters. The girls may not have disclosed the abuse to her, but it strains credulity to assert that she had no idea such abuse was possible, given the family's close living quarters. Rosalynn admitted she had suspicions her daughters were being abused. (Trial Tr. 353). She certainly knew Defendant controlled Gayla by threatening her children, she knew Defendant would follow through on such threats, and she was plainly aware Defendant had threatened her children. Based on her experience, Rosalynn knew Defendant would threaten any girls not to tell if sexual abuse occurred. The real threat of such sexual abuse of her own children would make her reluctant to flee without them.

22

### 2. *The sexual abuse of Defendant's own daughters was admissible under FRE 404(b) as proof of his motive and plan*.

"Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Burgess*, 576 F.3d 1078, 1098 (10th Cir. 2009), citing *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001). Fed. R. Evid. 404(b)(1) allows other crimes evidence to be admitted as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

This Court requires a district court apply a four-prong test to determine if the Rule 404(b) evidence is admissible. First, the court must determine if the evidence is offered for the proper purpose. Second, it must be relevant. Third, the court must determine, according to Rule 403, whether the probative value is substantially outweighed by its potential for unfair prejudice; and Fourth, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted. *United States v. Zamora,* 222 F.3d 756, 762 (10th Cir.2000).

### a. *The evidence was offered for the proper purpose.*

In the case at bar, Defendant was motivated to produce children who he could control to meet his sexual desires. He intended to keep Rosalynn from her family so he could impregnate her and, in turn, sexually abuse the resulting children.

23

Defendant abused numerous children under the age of 14 making it highly unlikely and nearly impossible that his sexual abuse of Rosalynn was a mistake or an accident. Rosalynn's kidnapping was preparation for his plan to create his own home where he could meet his perverse sexual needs without the risk of abducting strangers or exposing his actions with neighbor's children.  The evidence clearly shows his motive and plan, as found by the district court.

### b.  The evidence was relevant.

Relevant evidence is defined as evidence bearing on a consequential fact and having a "tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  The Government must prove at trial that Defendant kidnapped the victim for a benefit and she was not a consenting person. The sexual abuse of her, as well as the children he had with her, tended to prove the benefit Defendant sought in taking and transporting Rosalynn away from her mother. As previously stated, this evidence was part of the res gestae of the crime, but it also provided proof of his motive, preparation, and plan in carrying out the charged crimes.

### c.  The probative value of the evidence was not substantially outweighed by its potential for unfair prejudice.

All of the Government's evidence is generally prejudicial to the Defendant. The test is whether the prejudicial evidence is substantially outweighed by the potential of unfair prejudice.  The district court did not err in finding the evidence to

be highly probative and important to establish the elements of the crimes, the Defendant's benefit of having a bevy of children to sexually abuse, and the Defendant's use of force to maintain a cult-like atmosphere where he ruled supreme.

As this Court has held, "[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983).

> Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none. Here was no parade of horrors. We refuse to interfere with the trial court's exercise of its discretion.

*Id*. quoting, *United States v. McRae,* 593 F.2d 700, 707 (5th Cir. 1979).  The district court here, being fully aware of the facts and testimony in this complex case, weighed the questioned evidence and found FRE 403 did not require its exclusion. Defendant has failed to show the district court's ruling was erroneous or that the facts and law required exclusion of the evidence.

> *d. The Court repeatedly gave cautionary, limiting instructions to the jury.*

Throughout the trial and in the closing instructions, the district court consistently issued cautionary instructions to limit the jury in their consideration of such evidence. (Trial Tr. at 56, 147, 228, 234, 391, 422, 509, 5420, 564, 569)(Vol. I, *Instructions*, ROA at 361, 364).

> *3. Evidence of the sexual abuse that occurred before Defendant met Rosalynn was admissible pursuant to Fed. Rule Evid. 414.*

Counts One and Two both involved sexual abuse. Kidnapping involved sexual abuse as the benefit Defendant gained by kidnapping Rosalynn. The transportation of a minor charge involved the Defendant taking Rosalynn for the purpose of fulfilling his insatiable desire to sexually abuse children. The Defendant's sexual abuse of a school-age girl before meeting Rosalynn provided context for the charged crimes.

Cases involving the sexual abuse of children are fundamentally different from most any other criminal case. The dynamics involved include everything from the secrecy and shame associated with sexual abuse, to the difficulties that children have in disclosing the abuse, to the nature of the family relationships. Congress recognized the unique issues encountered in these cases when it enacted Rule 414 of the Federal Rules of Evidence, entitled "Similar Crimes in Child Molestation Cases".

Since Rule 414's enactment, this Court has upheld, on multiple different occasions, the use of Rule 414 in cases involving the sexual abuse of a child. In one of the first cases decided after Rule 414 was implemented, this Court distinguished Rule 414's application from that of Rule 404(b). In *United States v. Meacham*, 115 F.3d 1488, 1490 (10th Cir. 1997), the defendant was convicted of transporting a minor in interstate commerce with the intent to engage in sexual activity. The defendant complained on appeal that the district court should not have allowed allegations that he had also molested his two step-daughters some 30 years earlier. *Id*. Because Rule 414 had been newly enacted, the Tenth Circuit analyzed the admission of the evidence under both Rule 404(b) and Rule 414. *Id*. at 1491.

*Meacham* first held that Rule 414 "provides a specific admissibility standard in sexual assault cases, replacing [Rule] 404(b)'s general criteria" and that it "supersede[s] in sex offenses the restrictive aspects of Rule 404(b)." *Id*. The opinion then recognized that, pursuant to the language in Rule 414, "there is no time limit beyond which prior sex offenses by a defendant are inadmissible." *Id.* at 1492. This Court also recognized "clearly under Rule 414, the courts are to 'liberally' admit evidence of prior uncharged sex offenses." *Id*. In upholding the admission of the evidence that the defendant had previously molested his step-daughters, *Meacham* held that the evidence was admissible under both a Rule 404(b) analysis and a Rule

414 analysis and that the evidence was relevant to show the defendant's intent. *Id.* at 1492-1493.

Over the next ten years, this Court has provided additional guidance for analyzing prospective evidence under Rule 403 and when determining whether the probative value of the Rule 414 evidence is substantially outweighed by the danger of unfair prejudice. *See: United States v. Meacham,* 115 F.3d 1488 (10th Cir. 1997); *United States v. Guardia*, 135 F.3d 1326 (10th Cir. 1998); *United States v. Enjady*, 134 F.3d 1427 (10th Cir. 1998); *United States v. Castillo*, 140 F.3d 874 (10th Cir. 1998); and *United States v. McHorse*, 179 F.3d 889 (10th Cir. 1999).

In *United States v. Benally*, 500 F.3d 1085 (10th Cir. 2007), this Court relied upon the above-listed cases in providing a framework for trial courts to use when determining the admissibility of Rule 414 evidence. The defendant in *Benally* was tried for the crime of Aggravated Sexual Abuse of a Minor under the age of 16 while in Indian Country and Rule 414 evidence was allowed showing he molested four other girls some 20 and 40 years earlier. *Id*. at 1086, 1088. *Benally* recognized that Rule 414 is an exception to Rule 404's general admonition against evidence showing a defendant's propensity to commit bad acts. *Id.* This Court reiterated, "courts are to 'liberally' admit evidence of prior uncharged sex offenses" so that they can be "[c]onsistent with congressional intent regarding the admission of evidence tending to show the defendant's propensity to commit sexual assault or child molestation."

28

*Id.* at 1090. Ultimately, this Court concluded that the 414 evidence was highly probative because of "the similarity between the current charge and the prior acts," reiterating that "[e]vidence of other similar crimes involving sexual assault and child molestation was determined by Congress to be probative of a defendant's propensity to commit such crimes." *Id.* at 1091, 1093.

In *United States v. Koruh*, 2000 U.A. App. LEXIS 13210, *2, (unpublished)[9], this Court again rejected a defense argument that the Rule 414 evidence should not have been admitted because it occurred more than 16 years prior and it was prejudicial. In affirming the conviction, this Court found that the district court properly admitted the evidence as it was "probative because there were similarities between the alleged molestations" in that "[b]oth the alleged victims and the daughter are female and related to the defendant…the girls were each under the age of 12 years old at the time of the offense, and the molestations allegedly occurred in or near the defendant's homes." *Id.* at 13.

In 2016, the defendant in *United States v. Mercer*, 653 Fed.Appx. 622 (10th Cir. 2016), appealed his conviction on the grounds that evidence of the three children he had previously molested should not have been admitted under Rule 414 in his child pornography case. This Court noted the defendant "vigorously denied that he

---

[9] Unpublished decisions are not precedential, but may be cited for their persuasive value. 10th Cir. R. 32.1(A).

was guilty" and emphasized, "[t]he more seriously disputed the material fact, the more heavily this factor weighs in favor of admissibility." *Id.* at 628. The court specifically disagreed with the defendant's proposition that the 414 evidence led the jury to convict him "because a bad person deserves punishment." *Id.* at 629. Rather, this Court held, "Rule 414 evidence will almost always have a profound impact on the jury and cause it to feel disgust toward the defendant. Congress knew that when it enacted [the Rule] and intended to allow a fairly broad range of evidence to show the defendant's propensity." *Id.* at 629-630. The Mercer panel opined that "[t]o hold otherwise would undermine Rule 414 entirely." *Id.* at 629.

Recently, in *United States v. Magnan*, 2018 U.S. App. LEXIS 33353, \*30 (unpublished), this Court instructed that when considering the *Enjady* factors, "no single factor is dispositive." The *Magnan* opinion found the "need for testimony outside of the charged conduct was minimal" and weighed "slightly against the government". *Id.* at \*31. The court also found that "the amount of evidence regarding the charged conduct was so overwhelming in itself that [the 414] evidence surely would not be dispositive and most certainly did not need to be introduced." *Id.* at \*32. The court found that factor also "slightly weighed against admission." *Id.* However, because "on balance" the sub-factors weighed in favor of admission, the probative value was not substantially outweighed by the danger of unfair prejudice and the evidence was properly admitted. *Id.* at \*31 and \*33. *See also*,

*United States v. Batton*, 602 F.3d 1191, 1198 (10th Cir. 2010)("Despite the passage of time, the similarities between the victims and the conduct in each of the cases is striking—they fully support a pattern of grooming and assaulting young .. victims.").

In the case at bar, Defendant was accused of kidnapping an 11-year-old girl and traveling with her in interstate commerce for the purpose of perpetrating sexual abuse upon her. The evidence at trial proved Defendant began sexually abusing the victim when she was 11 years-old and that nine children were subsequently born of the abuse.

As in the *Meachum* case, supra, with respect to the Defendant's molestation of another child, the evidence was not restricted or prohibited by any time frame. Even so, the evidence introduced as to the only non-familial sexual abuse was minimal. Defendant's son Mike Piette testified he had seen Defendant place his hand inside Rosalyn's pants in the car during a ride to the store when she was 11 years old. (Trial Tr. 634). His brother Tobias Piette briefly described a striking similar incident involving "driving lessons" with an 8-year-old girl in Springfield, Missouri before they met Rosalynn. (Trial Tr. 571-574). The girl did not testify. The district court did not abuse its discretion in Tobias's testimony of the Defendant's uncharged sexual act with this young girl under Rule 414. The district court's decision to admit the testimony "comports with precedent and common sense." *United States v. Strum*, 673 F.3d 1274, 1283 (10th Cir. 2012).

31

Contrary to Defendant's assertions, the district court was not required to select one –and only one—basis for admitting the molestation evidence.  Depending on the purpose of the admission and the familial relation of each victim to Defendant, different rules provided different rationale for allowing the admission of the molestation evidence.  Given the limited nature of the evidence and the overwhelming evidence of guilt in this case, Defendant's conviction should not be overturned.

II.    THE DISTRICT COURT CORRECTLY DENIED DEFENDANT'S MOTION TO DISMISS THE § 2423(B) CHARGE ON STATUTE OF LIMITATIONS GROUNDS.

### A.    Standard of Review

This Court reviews *de novo* a district court's determination that a litigant's claims are not barred by the statute of limitations.  *United States v. Hurst*, 322 F.3d 1256, 1259 (10th Cir. 2003).

### B.    Procedural Background

Defendant filed a pre-trial motion to dismiss based on the statute of limitations.[10]    (Vol. I, *Motion to Dismiss*, ROA at 95-97).    The government responded.  (Vol. I, *Response to Motion to Dismiss*, ROA at 133-144).

The district court issued a written order denying the motion to dismiss.  (Vol.

---

[10] The motion also included a statute of limitation argument as to the kidnapping count which is not at issue in this appeal.

I, *Order Denying Dismissal*, ROA at 149-152). The district court held that § 2423(b) charge alleged in Count Two was not barred by the statute of limitations for pre-trial purposes. (Id.).

### C.    Discussion

Defendant expressly states that he is not advancing an argument under the Ex Post Facto Clause, U.S. Const., Art. I, § 9, cl.3., which "protects liberty by preventing governments from enacting statutes with 'manifestly unjust and oppressive' retroactive effects." *Stonger* v. *California*, 539 U.S. 607, 610-11 (2003). (*Def. Brf.* at 47, n.4.).

Instead, he argues the 2003 amendment to 18 U.S.C. § 3283, and the 2006 amendment to 18 U.S.C. § 3229, which extended the statute of limitations on the § 2423(b) travel charge cannot be applied retroactively to Defendant's conduct. (*Def. Brf.* at 46-52). He hangs his hat primarily on two decisions: *United States v. Miller*, 911 F.3d 638 (1st Cir. 2018) and *United States v. Gentile*, 235 F.Supp. 3d 649 (D.N.J. 2017). Neither case provides support for reversing Defendant's § 2423(b) conviction.

#### *1.   Extensions of the applicable Statute of Limitations*

On July 27, 2006, Congress enacted the Adam Walsh Child Protection and Safety Act of 2006 (hereinafter, the "Adam Walsh Act"), which created a comprehensive national system for the registration of sex offenders, increased the

statutory penalties for several child sex offenses, and created new federal child exploitation offenses. *See* Pub. L. No. 109-248, 120 Stat. 587 (Jul. 27, 2006). Additionally, Section 211 of the Adam Walsh Act eliminated the statute of limitations for most felony sex offenses. This revision to the limitations period was codified at 18 U.S.C. § 3299.

Section 3299 ("Child abduction and sex offenses") provides:

> Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense under section 1201 involving a minor victim, and for any felony under chapter 109A, 110 (except for section 2257 and 2257A), or 117, or § 1591.

18 U.S.C. § 3299 (2006).

Before the enactment of Section 3299, the statute of limitations for child sex offenses was governed by Title 18, United States Code, Section 3283 ("Offenses against Children"). The legislative history of Section 3283 extends back to 1990 when Congress, as part of the Crime Control Act of 1990, passed the Victims of Child Abuse Act of 1990 (hereinafter, the "Child Abuse Act"). *See* Pub. L. No. 101-647, 104 Stat 4789 (Nov. 29, 1990). Section 225(a) of the Child Abuse Act created a specific statute of limitations for offenses involving the sexual and physical abuse of children that was codified at 18 U.S.C. § 3509(k). Section 3509(k) provided in part:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such prosecution before the child reaches the age of 25 years.

18 U.S.C. § 3509(k) (1990).

The Child Abuse Act also added 18 U.S.C. § 3509(a)(8), which provided, and continues to provide, a broad definition of "sexual abuse": [T]he term "sexual abuse" includes the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually explicit conduct or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children[.] 18 U.S.C. § 3509(a)(8).

In 1994, Congress struck the statute of limitations language from Section 3509(k) and amended Section 3283 of Title 18, United States Code, Chapter 213 ("Limitations"), to contain this language verbatim. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 330018, 108 Stat. 1796 (Sept. 13, 1994) (hereinafter, the "Violent Crime Act").[11]   As a result, Section 3283 provided:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude

---

[11] Of note, the Violent Crime Act also amended Title 18, United States Code, Section 2423 to add "a new subsection" and create a new offense: Section 2423(b), the offense with which the Defendant is charged in Count Two of the Indictment. Pub. L. No. 103-322, § 160001(g), 108 Stat. 1796 (Sept. 13, 1994).

> such prosecution before the child reaches the age of 25
> years.

18 U.S.C. § 3283 (1994).

Notably, the definition of "sexual abuse" in Section 3509(a)(8) was untouched and remains, to date, the same.

On April 30, 2003, Congress passed the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act (hereinafter, the "PROTECT Act"). *See* Pub. L. No. 108-21, 117 Stat. 650 (Apr. 30, 2003). Section 202 of the PROTECT Act amended Section 3283 by extending the statute of limitations for offenses involving the sexual or physical abuse of a child to "during the life of the child." This amendment was aptly titled "NO STATUTE OF LIMITATIONS FOR CHILD ABDUCTION AND SEX CRIMES." *Id.* at § 202. As a result, Section 3283 provided:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child.

18 U.S.C. § 3283 (2003).

Section 3283 was amended again on January 5, 2006, when Congress passed the Violence Against Women and Department of Justice Reauthorization Act of 2005. *See* Pub. L. No. 109-162, 119 Stat. 2960 (Jan. 5, 2006). By that Act, Congress amended Section 3283 in order to permit criminal prosecution in child sexual or

physical abuse cases where the victim dies before the crime is charged. *Id.* at §

1182(c). As a result, Section 3283 currently provides:

> No statute of limitations that would otherwise preclude
> prosecution for an offense involving the sexual or physical
> abuse, or kidnaping, of a child under the age of 18 years
> shall preclude such prosecution during the life of the child,
> or for ten years after the offense, whichever is longer.

18 U.S.C. § 3283.

In January of 1997, 18 U.S.C. Section 3283 stated:

> No statute of limitations that would otherwise preclude
> prosecution for an offense involving the *sexual or physical
> abuse* of a child under the age of 18 years shall preclude
> such prosecution *before the child reaches the age of 25
> years*.

(Emphasis added).

Rosalynn was born on May 14, 1984. Her 25th birthday would have been on

May 14, 2009. In January 1997, she was 12 years of age. Before she reached 25

years of age, 18 U.S.C. § 3283 was amended again on January 5, 2006, and today

envisions no preclusions of prosecutions *during the life of the child, or for ten years

after the offense, whichever is longer*.

### 2. *Miller and Gentile do not support reversal based on retroactivity*

Defendant relies on the First Circuit's decision in *Miller* to argue that

Congress did not intend the 2003 and 2006 amendments to apply retroactively. (Def.

Brf. at 17, 49-50). Yet, the procedural posture of the *Miller* decision undermines

Defendant's conclusion.  In the 2018 *Miller* decision, the First Circuit affirmed on direct appeal without deciding Petitioner's ineffective assistance of counsel claim for failing to raise a retroactivity argument before allowing Mr. Miller to enter a guilty plea.  911 F.3d at 638, 644.  The First Circuit refused to grant relief of direct appeal, "[g]iven the *potential* potency of the limitations defense, the indicia of uncertainty that we have catalogued, the dearth of controlling case law, and our inability to evaluate the ineffective assistance claim without some insight into trial counsel's reasoning."  *Id*. at 644.  As a result, the language relied upon by Defendant here is not only from an out-of-circuit court, but is out-of-circuit dicta.

By the time the retroactivity issue surfaced again in Mr. Miller's case, in the proper posture as a post-conviction claim under § 2255, his argument was soundly rejected.  The Report and Recommendation issued in his § 2255 case demonstrates the preponderance of reported decisions weigh against the relief sought here:

> At least one court has declined to apply a new statute of limitations in a criminal case involving conduct predating the new statute's enactment even when the prior limitations periods had not yet elapsed, *United States v. Gentile*, 235 F. Supp. 3d 649, 654–56 (D.N.J. 2017), but in this specific criminal context, most courts that have considered the issue have found no impermissible retrospective effect and applied the new limitations periods. *United States v. Sure Chief*, 438 F.3d 920, 924–25 (9th Cir. 2006); *United States v. Jeffries*, 405 F.3d 682, 684–85 (8th Cir. 2005); *United States v. Nader*, 425 F. Supp. 3d 619, 627-631 (E.D. Va. 2019); *United States v. Vickers*, No. 13-CR-128-A, 2014 WL 1838255, at *7–11 (W.D.N.Y. May 8, 2014); *United States v. Shepard*, No.

38

> 4:10 CR 415, 2011 WL 3648065, at *2 (N.D. Ohio Aug.
> 18, 2011).

*United States v. Miller*, 2021 WL 311860, at *6 (D.Me. Jan. 29, 2021)(slip opinion).

The Report and Recommendation found no ineffective assistance, "Because the statutory amendments extended the limitations period before it had elapsed in Petitioner's case, application of the new statutes did not have an impermissibly retrospective effect that would trigger the presumption against retroactivity, and prosecution was not barred by the statute of limitations." *Id*.  The district judge in Maine affirmed denial of §2255 relief and adopted the Report and Recommendation without revision.  *United States v. Miller*, 2021 WL 787133, at *1 (D.Me. March 1, 2021).

Defendant's remaining authority is likewise unpersuasive.  While *United States v. Gentile*, 235 F.Supp. 3d 649 (D.N.J. 2017), did "refuse to apply a revised statute of limitations retrospectively," as asserted in Defendant's brief at p. 50, the case offers limited, if any, solace to Defendant here.  *Gentile* is not a decision interpreting the 2003 or 2006 amendments at issue in the child sexual abuse arena – *Gentile* is securities fraud case arising in connection with "pump-and-dump" schemes.  *Id*.  The *Gentile* court was concerned with the "Dodd–Frank Wall Street Reform and Consumer Protection Act" ("Dodd–Frank") on July 21, 2010, and the six-year statute of limitations for securities fraud violations contained therein."  *Id*. at 651.  Neither *Miller* nor *Gentile* support reversal in this case.

III.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY REGARDING A SPECIAL INTERROGATORY NEEDED TO RULE ON DEFENDANT'S AFFIRMATIVE DEFENSE TO THE KIDNAPPING COUNT.

**A.    Standard of Review**

Defendant admits his challenge to the "Duration of Kidnapping" instruction was not preserved below and is therefore subject to plain error analysis.  (Def. Brf. at 25, 52-53).

**B.    Discussion**

The district court correctly instructed the jury on kidnapping as charged in count one of the indictment.  (Vol. I, *Instructions*, ROA at 369 ["Statute Defining Offense Charged"], 370 ["Essential Elements –Count 1"], 371 ["Consent"]).  After these instructions, the district court gave the following supplemental instruction:

**DURATION OF KIDNAPPING**

The government contends that the kidnapping alleged in Count 1 extended from January 1997 until July 28, 2016.

Under the law, if the victim of a kidnapping is no longer held against her will, the kidnapping is over.

As one of the defenses, defendant contends Rosalyn McGinnis was (if at all), at a date earlier than July 28, 2016, no longer held against her will.

Defendant must prove this contention by a preponderance of the evidence, which is defined as "more likely than not."

40

On the verdict form, **only if you have found the defendant guilty as to Count 1**, you will be asked to determine if Rosalyn McGinnis was no longer held against her will at an earlier date, and what that date was. This will aid the court in making a separate legal determination in regard to this case.

In determining if Rosalyn McGuinness was continually held against her will (physically and/or psychologically), you should consider all the testimony you have heard in the case.

(Vol. I, *Instructions*, ROA at 372)(Emphasis added).[12]

Contrary to Defendant's assertions, the issue here is not whether "the prosecution started within the applicable statute of limitations." (Def. Brf. at 56). The issue here is whether the continuing offense of kidnapping ended at a date earlier enough for Defendant to advance a colorable statute of limitations affirmative defense.

A defendant bears the burden of establishing facts necessary to establish an affirmative defense where that fact is not an element of the charged crime. *United States v. McIntosh*, 514 Fed. Appx. 776, 780, n.2 (10th Cir. 2013)(citing *Smith v.*

---

[12] In its written order denying Defendant's motion to dismiss on limitation grounds, the district court had forecast such an instruction. (Vol. I, *Order Denying Dismissal*, ROA at 147, n.3)("the government will seek to demonstrate that this kidnapping continued uninterrupted (with the victim held involuntarily against her will) from in or about January, 1997 until July 28, 2016. Any "break" within this period would affect calculation of the statute of limitations. *See United States v. Toledo,* 985 F.2d 1462, 1467 (10th Cir.1993)(if the victim is no longer being held against her will, the kidnapping has ended). This factual issue will likely be submitted to the jury by way of interrogatory.").

*United States,* ⸺ U.S. ⸺, 133 S.Ct. 714, 720 (2013)("Defendant would also bear the burden of proving his withdrawal if he had invoked it as an affirmative defense.").  Simply referring to *In re Winship*, 397 U.S. 358 (1970), is not sufficient to show error, much less plain error.  (Def. Brf. at 54).

In *Smith*, the Supreme Court held: "Allocating to a defendant the burden of proving withdrawal does not violate the Due Process Clause.  While the Government must prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [the defendant] is charged," *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required," *Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)."  133 S.Ct. at 719.  The *Smith* case addressed the need to prove withdrawal from a conspiracy in order to avoid criminal liability.  *Smith* clarified that proving such factual issues are the burden of the defendant.  *Id*.

The Fifth Circuit recently clarified the basis for the *Smith* holding:

> Hornbook criminal law distinguishes between offense elements and affirmative defenses. *See* Paul H. Robinson, *Criminal Law Defenses: A Systematic Analysis*, 82 Colum. L. Rev. 199, 291 n.164 (1982) ("The distinction between offenses and defenses is perhaps the most basic distinction in criminal law that lawyers ... recognize."). The distinction has constitutional significance; while "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged[,] ... [p]roof of the nonexistence of all affirmative defenses has never been constitutionally required."

> *Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319,
> 53 L.Ed.2d 281 (1977); *see also Smith v. United States*,
> 568 U.S. 106, 110, 133 S.Ct. 714, 184 L.Ed.2d 570 (2013)
> ("Where [an affirmative defense] 'excuse[s] conduct that
> would otherwise be punishable,' but 'does not controvert
> any of the elements of the offense itself,' the Government
> has no constitutional duty to overcome the defense beyond
> a reasonable doubt.") (quoting *Dixon v. United States*, 548
> U.S. 1, 6, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006)).

*United States v. Ortiz*, 927 F.3d 868, 873 (5th Cir. 2019).

The district court here did not require Defendant to prove any essential element of the kidnapping offense. Instead, the district court made plain that the challenged instruction and special interrogatory were not to be considered unless the jury had already found Defendant guilty on Count One. (Vol. I, *Instructions*, ROA at 372). The district court did not err, much less plainly err, in giving the challenged instruction relating to a factual finding necessary to evaluate Defendant's previously-raised statute of limitations affirmative defense.

IV.  **THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING DEFENDANT HAD NOT MADE A CLEAR UNEQUIVOCAL REQUEST FOR SELF-REPRESENTATION AT SENTENCING.**

**A.**    **Standard of Review**

"When a motion to proceed pro se is made, we review de novo whether a constitutional violation occurred and for clear error the factual findings underlying the district court's decision to deny the motion." *United States v. Simpson,* 849 F.3d 1039, 1046 (10th Cir. 2017), quoting *United States v. Smith*, 413 F.3d 1253, 1279

(10th Cir. 2005), *abrogated on other grounds by Boyle v. United States*, 556 U.S. 938 (2009).

### B.    Discussion

At the sentencing in this matter, the district court marked and introduced into the record "Court Exhibit 1" comprised of nearly 600 pages of letters received from Defendant.  (Sent. Tr. 4-5, 47-51).  These documents are included in the record on appeal in Sealed Volumes 4-9.  These letters contained multiple, repeated comments on his defense counsel and defense investigators – the majority of which were negative.  (Sealed Court Exhibit 1 at 13-14, 48, 51, 62. 64, 68, 81-82, 87, 90, 94, 98, 107, 110-114, 117, 119, 120-121, 134, 138, 142, 151-152, 154-155, 158, 162-164, 170, 174-175, 178, 185, 189,192, 195, 199, 203, 205-207, 211-212, 214-215, 218-220, 230, 232-233, 238-240, 244, 247, 248, 251-254, 256, 261, 268, 273-275, 282-284, 2869, 288, 297, 299, 303-304, 307, 309, 320-326, 330, 335-336, 375, 388, 395, 402, 415, 421, 435, 438, 463, 467, 472, 477, 489, 491, 500-501, 503, 506, 533, 541, 563-564, 571-573, 579-580).[13]

The district court explained at the sentencing that Defendant's appointed attorney would remain through the sentencing and to insure Defendant's pro se notice of appeal was timely filed.  (Sent. Tr. at 3-6).  The district court also addressed

---

[13] These citations do not include approximately 20 pages other pages with Defendant complaining about his previous attorney, a Federal Public Defender, who the court allowed to withdraw before appointing his trial and sentencing attorney.

the pertinent points in evaluating a request for self-representation:

> THE COURT: All right. Thank you. Moving to the -- the letters are made exhibits for the reason that they both support and contrast or somewhat vitiate the request for new counsel. At some points in time Mr. Piette expressed vast disagreement with counsel and at other times Mr. Piette thought Mr. Gotcher was the best thing since sliced bread. So there is conflicting evidence whether there has been a complete breakdown of the attorney/client relationship, but the Court will err on the side of giving Mr. Piette new counsel for appeal purposes.

(Sent. Tr. 6).

This Court recognizes the fundamental rights at play when a defendant seeks self-representation:

> The Sixth Amendment provides criminal defendants with the right to represent themselves. *Faretta v. California*, 422 U.S. 806, 819-20, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). But this right lies in tension with the Sixth Amendment right to counsel. *Id.* at 832, 95 S.Ct. 2525 (noting that self-representation "cut[s] against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel"). The right to counsel helps to assure a defendant a fair trial. *Id.* at 832–33, 95 S.Ct. 2525. By contrast, self-representation ordinarily undermines the defendant's chance of a favorable outcome. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). In light of this reality, we have noted that the right to counsel serves "both the individual and collective good," while the right to self-representation protects only "individual interests." *United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir. 2000) (citation omitted).

*Simpson,* 849 F.3d at 1046. The court requires a "clear and unequivocal" expression of a request for self-representation. *Id*. at 1047, citing *United States v. Miles*, 572 F.3d 832, 836 (10th Cir. 2009).

Here, there was no clear and unequivocal request for self-representation at sentencing in light of his prolific and varied correspondence with the district court. When asked at sentencing if he was amenable with his current counsel continuing through the sentencing hearing, Defendant stated that was fine with him. (Sent. Tr. 6). Finally, the district court allowed Defendant to speak on his own behalf for nearly thirty transcript pages before imposing sentence. (Sent Tr. 16-43).

The district court properly applied the law in rejecting any request for self-representation at sentencing and reversal is not warranted.

## <u>CONCLUSION</u>

Based upon the foregoing arguments and authorities, the United States urges this Court to affirm the district court's denial of Defendant's conviction and sentence.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The United States respectfully suggests that oral argument in this complex case would materially aid this Court in the resolution of this case.

Respectfully submitted,

CHRISTOPHER J. WILSON
Acting United States Attorney

Linda A. Epperley, Okla. Bar No. 12057
Sarah McAmis, Okla. Bar No. 15903
Assistant United States Attorneys
520 Denison Avenue
Muskogee, Oklahoma  74401
Telephone: (918) 684-5100
Facsimile: (918) 684-5150
linda.epperley@usdoj.gov
sarah.mcamis@usdoj.gov

## CERTIFICATE OF WORD COUNT COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  According to MS Word 2016, this brief contains 11,424 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

*/s/Linda A. Epperley*

## **CERTIFICATE OF DIGITAL SUBMISSION**

I certify that:

- all required privacy redactions have been made;

- that with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document filed with the Clerk;

-that the ECF submission was scanned for viruses using McAfee Endpoint Security 10.5.3.3178, updated continuously, and according to the program is free of viruses.

*/s/Linda A. Epperley*

## **CERTIFICATE OF ECF FILING & DELIVERY**

I hereby certify that on March 16, 2021, I electronically transmitted the attached documents to the Clerk of Court using the CM/ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's CM/ECF filing system to counsel for Defendant/Appellant:

Alan S. Mouritsen
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
ecf@parsonsbehle.com
amouritsen@parsonsbehle.com

*/s/Linda A. Epperley*

48