No. 20-7008

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

United States of America,
Plaintiff-Appellee

v.

Henri Piette,
Defendant-Appellant.

_____

**Petition for Rehearing or Rehearing En Banc**

On Appeal from the United States District Court for the
Eastern District of Oklahoma
Case No. 6:17-cr-00079-RAW
The Honorable Ronald A. White

Alan S. Mouritsen
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
ecf@parsonsbehle.com
amouritsen@parsonsbehle.com
*Counsel for Defendant-Appellant*

September 15, 2022

## **TABLE OF CONTENTS**

INTRODUCTION AND RULE 35(B) STATEMENT ............................... 1

BACKGROUND ........................................................................ 3

REASONS FOR GRANTING REHEARING  OR REHEARING EN
      BANC.......................................................................... 6

I.    THE PANEL OPINION MISAPPREHENDS THE
      RETROACTIVE EFFECT OF THE 2003 PROTECT ACT. ........... 6

II.   THE PANEL SPLITS WITH OTHER CIRCUITS ON WHAT
      MAKES THE EXTENSION OF A CRIMINAL STATUTE OF
      LIMITATIONS IMPERMISSIBLY RETROACTIVE. ................... 10

CONCLUSION ...................................................................... 14

# TABLE OF AUTHORITIES

## Cases

*De Niz Robles v. Lynch,*
  803 F.3d 1165 (10th Cir. 2015) ............................................. 12

*Dobbs v. Anthem Blue Cross & Blue Shield,*
  600 F.3d 1275 (10th Cir. 2010) .............................................. 8

*Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg.*
  *Acceptance Co.*, 391 F.3d 401 (2d Cir. 2004) ........................ 13

*Fernandez-Vargas v. Gonzales,*
  548 U.S. 30 (2006) ................................................................. 9

*Hughes Aircraft Co. v. U.S. ex rel. Schumer,*
  520 U.S. 939 (1997) .............................................................. 13

*INS v. St. Cyr,*
  533 U.S. 289 (2001) ............................................................... 8

*Landgraf v. USI Film Products,*
  511 U.S. 244 (1994) ......................................................... 5, 13

*Nasrallah v. Barr,*
  140 S. Ct. 1683 (2020) ........................................................... 8

*Reynolds v. McArthur,*
  27 U.S. (2 Pet.) 417 (1829) .................................................. 12

*S. Furniture Leas., Inc. v. YRC, Inc.,*
  989 F.3d 1141 (10th Cir. 2021) .............................................. 9

*Somerlott v. Cherokee Nation Distributors, Inc.,*
  686 F.3d 1144 (10th Cir. 2012) .............................................. 9

*Toussie v. United States,*
  397 U.S. 112 (1970) ......................................................... 11, 12

*Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm.,*
  203 F.3d 733 (10th Cir. 2000) ............................................... 9

*United States v. Delano,*
  981 F.3d 1136 (10th Cir. 2020) ............................................................ 12

*United States v. Gentile,*
  235 F. Supp. 3d 649 (D.N.J. 2017)....................................................... 12

*United States v. Miller,*
  911 F.3d 638 (1st Cir. 2018) ................................................................ 10

*United States v. Murry,*
  31 F.4th 1274 (10th Cir. 2022) ............................................................... 9

*United States v. Richardson,*
  512 F.2d 105 (3d Cir. 1975) ........................................................... 11, 12

*Vanegas v. Signet Builders,* Inc.,
  46 F.4th ---, 2022 WL 3572769 (7th Cir. Aug. 19, 2022)....................... 9

*Weingarten v. United States,*
  865 F.3d 48 (2d Cir. 2017) ................................................................... 10

## Statutes

18 U.S.C. § 2243(a) ..................................................................................... 4

18 U.S.C. § 2423(b) (West 1998) ....................................................... passim

18 U.S.C. § 3283 (West 2003)............................................................. 1, 4, 7

# INTRODUCTION AND RULE 35(b) STATEMENT

Mr. Piette seeks rehearing and rehearing en banc on two grounds, both focused on the panel's retroactivity analysis. (Op. 26–33.) First, rehearing is warranted because the Court's holding on retroactivity is based on a misapprehension of the relevant law. In finding that extending the statutes of limitation did not have "an impermissible retroactive effect," the panel emphasized that the change in the law had not raised "the penalty for the charged offense." (Op. 32.) That statement is simply not accurate.

When the statute of limitations started to run on Mr. Piette's § 2423(b) offense on May 14, 2000, Mr. Piette faced a maximum penalty of 15 years for that offense. 18 U.S.C. § 2423(b) (West 1998). Three years into the limitations period, in April 2003, Congress passed the Protect Act, which extended the statute of limitations on offenses committed under 18 U.S.C. § 2423(b) to the "life of the child." *See* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (the "Protect Act"), Public Law 108–21, Apr. 30, 2003, 117 Stat. 650, § 202, *codified at* 18 U.S.C. § 3283 (West 2003). In addition to extending the statute of limitations on § 2423(b) offenses,

the Protect Act *also increased* the maximum penalty for such offenses from 15 years' imprisonment to 30. *Id.* § 105(a), *codified at* 18 U.S.C. § 2423(b) (West 2003).

Thus, under the law in effect at the time the limitations period first began to run, Mr. Piette faced a maximum sentence of 15 years. Under the law in effect at the time he was charged, by contrast, he faced a maximum sentence of 30 years. This change affected Mr. Piette directly—the district court sentenced him to the maximum sentence of 30 years. Vol. 1:419. Thus, Congress had not just "raised the penalty for the charged offense" in the middle of the running limitations period; it had *doubled* it. Because a new law's twofold increase of a potential prison sentence creates an impermissible retroactive effect under binding precedent, the panel should grant the petition, correct its mistaken statement, and vacate Mr. Piette's § 2423(b) conviction as untimely.

Second, the panel opinion should be reheard en banc to correctly answer this "question of first impression" in the first instance. The panel's analysis calls for en banc attention in three different ways. First, as noted above, the panel mistakenly assumed that retroactively

applying the new statutes of limitation did not subject Mr. Piette to an enhanced penalty. To the contrary, he was sentenced to 15 more years' imprisonment than he could have received under the prior law. Second, the panel gave insufficient attention to the criminal context. The Supreme Court has long declared that criminal statutes of limitation should be interpreted in favor or repose. A categorical rule that extending unexpired statute of limitations never runs afoul of retroactivity principles cannot be squared with that maxim. Third, the panel gave short shrift to the longstanding presumption against retroactivity. From time immemorial, laws have applied only prospectively, not retrospectively. Only in the clearest of circumstances is that presumption overcome.

For these reasons, rehearing or rehearing en banc is warranted.

## **BACKGROUND**

As relevant to this petition, a jury convicted Mr. Piette of an offense under 18 U.S.C. § 2423(b), which criminalizes traveling in interstate commerce "with a motivating purpose of engaging in any illicit sexual conduct [defined as certain sexual acts with a person under 18 years of age]." 18 U.S.C. § 2423(b). As the Court recognizes (Op. 27),

the statute of limitations began to run on this charge no later than May 14, 2000, when Ms. McGinnis turned sixteen. *See* 18 U.S.C. § 2243(a). At that time, the statute of limitations for offenses committed under § 2423 expired on the victim's 25th birthday (in this case, May 14, 2009), and the statute carried a maximum sentence of no more than 15 years. Protection of Children from Sexual Predators Act of 1998, Public Law 105–314, Oct. 30, 1998, 112 Stat. 2974, § 103(2), codified at 18 U.S.C. § 2423(b) (West 1998).

Three years after the statute of limitations had already started running, Congress enacted the Protect Act, Public Law 108–21, Apr. 30, 2003, 117 Stat. 650. As relevant here, the Protect Act modified two aspects of Title 18. First, it extended the statute of limitations for sex crimes involving children to the "life of the child." *Id.* § 202, *codified at* 18 U.S.C. § 3283 (West 2003). Second, it increased the maximum prison sentence for offenses under § 2423(b) from 15 years to 30. *Id.* § 105(a), *codified at* 18 U.S.C. § 2423(b) (West 2003).

In the district court, Mr. Piette argued that the traveling-with-intent charge was untimely because the statutes extending the limitations period had an impermissible retroactive effect. The district

court was unpersuaded. "The district court ruled that because the original statute of limitations had not already expired when Congress acted, the legislature validly extended a live charging period, rendering [Mr. Piette's] 2017 indictment timely." (Op. 11.) Mr. Piette renewed this argument in an oral motion for acquittal at the conclusion of the government's case-in-chief, which the district court denied.

The panel affirmed the district court's ruling. Applying the two-step process called for in *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994), the panel agreed with Mr. Piette at the first step that the statutes extending the limitations period on his § 2423(b) offense did not "expressly announc[e] a retroactive effect." (Op. 30.) Because neither statute "literally stat[ed] that [it] applies retroactively," the panel "proceed[ed] to *Landgraf*'s second step." (Op. 31.)

At the second step, the panel addressed whether applying the extended statutes of limitation to Mr. Piette's offense created an "impermissible retroactive effect, defined as an effect that 'would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." (Op. 31.). In the panel's view, the change in the law

did not have this kind of effect on Mr. Piette. The panel reasoned that, although it is typically impermissible to revive stale claims, there was nothing wrong with extending a statute of limitations that "had not yet expired." (Op. 32.) As the panel explained:

> By extending the unexpired statute of limitations, Congress did not increase Piette's exposure to prosecution retroactively. It did not raise the penalty for the charged offense. It did not redefine the offense to make it easier to establish. It did not expose Piette to criminal prosecution anew. It merely altered the ongoing charging period for the conduct that had already exposed him to criminal prosecution. . . . A dead charge was not resurrected, and the underlying nature of Piette's potential criminal liability remained the same.

(Op. 32.)  As a result, the panel held, "neither statute of limitations had an impermissible retroactive effect." (Op. 32–33.).

## REASONS FOR GRANTING REHEARING OR REHEARING EN BANC

## I.    THE PANEL OPINION MISAPPREHENDS THE RETROACTIVE EFFECT OF THE 2003 PROTECT ACT.

In holding that applying the new statutes of limitation to Mr. Piette's past conduct did not violate principles of retroactivity, the panel mistakenly stated that Congress "did not raise the penalty for the charged offense." The panel should correct that mistake and dismiss Mr. Piette's § 2423(b) offense as untimely.

At the time the statute of limitations started running on his

§ 2423(b) offense in May 2000, Mr. Piette faced a maximum prison

sentence of 15 years. *See* Protection of Children from Sexual Predators

Act of 1998, Public Law 105–314, Oct. 30, 1998, 112 Stat. 2974,

§ 103(2), *codified at* 18 U.S.C. § 2423(b) (West 1998). About three years

later, Congress passed the Protect Act, which extended the statute of

limitations on § 2423(b) offenses to "the life of the child." Protect Act,

Public Law 108–21, Apr. 30, 2003, 117 Stat. 650, § 202, *codified at* 18

U.S.C. § 3283 (West 2003). In the same Act, Congress also increased the

maximum prison sentence for offenses under § 2423(b) from 15 years to

30. *Id.* § 105(a), *codified at* 18 U.S.C. § 2423(b) (West 2003) ("Section

2423 of title 18, United States Code, is amended by striking subsection

(b) and inserting the following: . . . A person who [commits an offense

under this provision] shall be fined under this title or imprisoned not

more than *30 years*, or both." (emphasis added)).

As this summation demonstrates, under the law that existed at

the time Mr. Piette's offense was completed and the statute of

limitations began to run, charges had to be brought against him by May

14, 2009, and he faced a maximum prison sentence of *15 years*. Under

the law passed three years later, charges could be brought against him as long as Ms. McGinnis lived and he faced a maximum prison sentence of 30 years. Thus, applying the Protect Act, passed in 2003, to Mr. Piette's past conduct, completed in 2000, exposed Mr. Piette to an additional fifteen years' imprisonment, double what he was previously exposed to.

Adding fifteen years to a potential prison term undoubtedly increased Piette's "liability for past conduct." *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1282 (10th Cir. 2010). Indeed, if there is a "clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation," there is unquestionably a clear difference between facing 15 years in prison and facing 30 years in prison. *See INS v. St. Cyr*, 533 U.S. 289, 325 (2001), *superseded by statute as stated in Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020). And, as mentioned above, the district court took advantage of this change by sentencing Mr. Piette to 30 years on the § 2423(b) offense. Vol. 1:419. Applying the new statutes of limitation to

Mr. Piette's past conduct is therefore impermissibly retroactive because doing so exposed him to 15 more years in prison.[1]

Under the circumstances, the panel should correct its statement that Congress did not increase the penalty to which Mr. Piette was exposed, revise its retroactivity analysis to make clear that exposing Mr. Piette to 15 years' additional imprisonment undoubtedly "increase[d] [his] liability for past conduct," *see Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006), and vacate his § 2423(b) conviction as untimely filed.

---

[1] As the panel recognizes (Op. 11), Mr. Piette preserved his challenge to the retroactivity problems with the extended statutes of limitation by "alert[ing] the district court to the issue and seek[ing] a ruling." *Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1150 (10th Cir. 2012). In now directing the panel's attention to the increased penalty the new law exposed him to, Mr. Piette does "not rely on a new legal theory." *United States v. Murry*, 31 F.4th 1274, 1287–88 (10th Cir. 2022), *petition for cert. filed* July 18, 2022. Instead, he merely offers additional legal authority in support of a preserved theory. *See Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm.*, 203 F.3d 733, 736 (10th Cir. 2000) (review of a district court's legal conclusions is plenary); *Vanegas v. Signet Builders*, Inc., 46 F.4th ---, 2022 WL 3572769, at *7 (7th Cir. Aug. 19, 2022) ("A party has the right to refine its arguments on appeal."). And even if he were introducing a new legal theory, the panel should "exercise [its] discretion to consider [the statutory argument] in the interest of [adopting] correct [retroactivity principles], 'a strictly legal question.'" *S. Furniture Leas., Inc. v. YRC, Inc.*, 989 F.3d 1141, 1147 n.2 (10th Cir. 2021).

II. **THE PANEL SPLITS WITH OTHER CIRCUITS ON WHAT MAKES THE EXTENSION OF A CRIMINAL STATUTE OF LIMITATIONS IMPERMISSIBLY RETROACTIVE.**

If the panel declines to correct its inaccurate statement that Congress "did not raise the penalty for the charged offense" after the statute of limitations had already started running (Op. 32), the Court should still rehear this matter en banc to ensure that it answers this "question of first impression" (Op. 28) correctly. As the panel notes (Op. 28), several other courts have addressed whether to retroactively apply the "new statutes of limitation" to offenses under § 2423(b). But this Court is the first circuit to address the issue on the "merits." (Op. 28.) Thus, not only is this a "question of first impression in this circuit," it is a question of first impression in all circuits, at least on a *de novo* standard of review. *Cf. United States v. Miller*, 911 F.3d 638, 642–46 (1st Cir. 2018) (analyzing the issue in the context of a claim for ineffective assistance of counsel); *Weingarten v. United States*, 865 F.3d 48, 54–58 (2d Cir. 2017) (same). As the first circuit to address the issue on the merits, it is especially important that the panel get it right.

For three reasons, the panel's opinion warrants en banc rehearing. First, as mentioned above, the Protect Act did not just extend the

unexpired statute of limitations on Mr. Piette's § 2423(b) offense; it also doubled the penalty to which Mr. Piette was exposed. Every circuit in the country, as well as the Supreme Court, would treat that as an impermissible retroactive effect. This Court should do the same.

Second, the panel did not address how the criminal context affects the analysis. To be sure, the panel noted, citing the First Circuit, "that the question's difficulty is compounded by the criminal context." (Op. 31.) The panel also cited *Toussie v. United States*, 397 U.S. 112, 115 (1970), for the proposition "that statutes of limitation should be 'liberally interpreted in favor of repose.'" (Op. 31.) But in the end, these were nothing more than asides. After briefly referring to the criminal context, the panel simply analyzed the question much like it would in the civil context, finding no impermissible retroactive effect in extending a statute of limitations that had not yet expired. (Op. 31–32.)

Other courts have approached this issue differently. In *United States v. Richardson*, 512 F.2d 105 (3d Cir. 1975), for example, the court pointed out, much like the panel did, that Congress "has the power to extend the period of limitations without running afoul of the ex post facto clause, provided the period has not already run." *Id.* at 106. The

court went on, however, to emphasize that "criminal statutes of limitations . . . are to be interpreted in favor of repose." *Id.* (citing *Toussie*). As a result, the court refused "to hold that Congress in fact ha[d] exercised its power to extend the limitations period . . . unless [the court] discern[ed] a clear intention" to do so. *Id.* Unlike in the civil context, therefore, the Third Circuit refused to apply a new criminal statute of limitations retroactively without evidence that Congress clearly intended that result. *See United States v. Delano*, 981 F.3d 1136, 1139 (10th Cir. 2020); *United States v. Gentile*, 235 F. Supp. 3d 649, 655 (D.N.J. 2017). The panel should have done the same here.

Third, the panel gave insufficient attention to the longstanding presumption against retroactivity. As this Court explained not long ago:

> It is a principle which has always been held sacred in the United States, that laws by which human action is to be regulated, look forwards, not backwards; and are never to be construed retrospectively unless the language of the act shall render such construction indispensable.

*De Niz Robles v. Lynch*, 803 F.3d 1165, 1169 (10th Cir. 2015) (quoting *Reynolds v. McArthur*, 27 U.S. (2 Pet.) 417, 434 (1829) (Marshall, C.J.)). These principles, extant since the founding, give rise to "a presumption against retroactive legislation that is deeply rooted in [the Supreme

Court's] jurisprudence." *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 946 (1997). Federal courts must "apply this time-honored presumption unless Congress has clearly manifested its intent to the contrary." *Id.*

The panel stated (Op. 31) that the presumption did not apply unless it first found that the extended statutes of limitations had an impermissible retroactive effect. But for one thing, as noted above, if increasing Mr. Piette's maximum sentence from 15 years to 30 does not qualify as an impermissible retroactive effect, it is not clear what would. For another, as at least one other circuit has held, "[e]xtending the statute of limitations retroactively 'increase[s] [a defendant's] liability for past conduct' by increasing the period of time during which a defendant can be sued." *Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 410 (2d Cir. 2004) (quoting *Landgraf,* 511 U.S. at 280). If this is true in the civil context, it is even more true in the criminal context.

## <u>CONCLUSION</u>

For these reasons, the panel opinion should be reheard or reheard en banc.

/s/ Alan S. Mouritsen
Alan S. Mouritsen
Parsons Behle & Latimer
*Attorneys for Appellant Piette*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Alan S. Mouritsen, hereby certify as follows:

1.     This **Petition for Rehearing or Rehearing En Banc**
complies with the word limits imposed by Rules 35(b)(2)(A) and 40(b)(1)
because it contains 2,794 words.

2.     This **Petition for Rehearing or Rehearing En Banc**
complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and
the type style requirements of Fed. R. App. P. 32(a)(6) because it has
been prepared in a proportionally spaced typeface using Microsoft Word
2016, in 14-point Century Schoolbook type.

Dated: September 15, 2022

s/ Alan S. Mouritsen
Alan S. Mouritsen

## CERTIFICATE OF COMPLIANCE

I, Alan S. Mouritsen, hereby certify as follows:

1.      all privacy redactions have been made;

2.      the ECF submission of the foregoing **Petition for Rehearing or Rehearing En Banc** was scanned for viruses with the most recent version of Windows Security and, according to the program, is free of viruses.

/s/ Alan S. Mouritsen
Alan S. Mouritsen

## CERTIFICATE OF SERVICE

In accordance with 10th Cir. R. 25.4, I, Alan S. Mouritsen, hereby certify that on September 15, 2022, I electronically served a copy of the **Petition for Rehearing or Rehearing En Banc** via ECF, which, in turn, accomplished electronic service on the following.

Linda A. Epperley
Sarah McAmis
Office of the United States Attorney
Eastern District of Oklahoma
Tel: 918-684-5100
520 Denison Avenue
Muskogee, OK 74401
linda.epperley@usdoj.gov
sarah.mcamis@usdoj.gov

/s/ Alan S. Mouritsen
ALAN S. MOURITSEN

*Attorney for Appellant*

# Exhibit A

FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

**August 18, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

HENRI MICHELLE PIETTE, a/k/a Henri
Michel Piette, a/k/a Henri Billy, a/k/a Dan
Reed, a/k/a Billy Ira Sloop, Jr., a/k/a
Michael Wayne Mansfield, a/k/a
Christopher Allen McAnear,

      Defendant - Appellant.

No. 20-7008

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:17-CR-00079-RAW-1)**
_____

Alan S. Mouritsen, Parsons Behle & Latimer, Salt Lake City, Utah, for Defendant-
Appellant.

Linda A. Epperley, Assistant United States Attorney (Christopher J. Wilson, Acting
United States Attorney, and Sarah McAmis, Assistant United States Attorney, with her
on the brief), Office of the United States Attorney, Muskogee, Oklahoma, for Plaintiff-
Appellee.

_____

Before **McHUGH**, **EBEL**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

A jury in the Eastern District of Oklahoma convicted Henri Piette of kidnapping and traveling with intent to engage in sexual relations with a juvenile. The district court sentenced Piette to life imprisonment on the former conviction and 360 months' imprisonment on the latter. He seeks to have his convictions overturned or his sentence reversed. We hold that the district court did not err by admitting evidence of Piette's uncharged acts of molestation, and that statutes extending the unexpired charging period for the traveling-with-intent charge did not have an impermissible retroactive effect. However, we conclude that the district court plainly erred by misallocating the burden of proof once Piette disputed the timing of the kidnapping by arguing that the victim, Rosalynn McGinnis, consented. If she had consented, the kidnapping would have been over, and the statute of limitations would have begun to run, potentially rendering the indictment untimely. We reverse Piette's kidnapping conviction because there is a difference between what happened here—Piette failing to prove by a preponderance of the evidence that McGinnis ever consented—and what the Constitution requires: the government proving beyond a reasonable doubt that she never consented at a time that would cause a statute of limitations problem. Finally, we reject Piette's argument that he was denied his Sixth Amendment right to self-representation at sentencing. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## I.

### a.

The following account is based on trial testimony. Rosalynn McGinnis was born in 1984. In the early 1990s, McGinnis lived in Springfield, Missouri, with her parents, Gayla and Michael, and several siblings. One day, while playing at the park, the McGinnis children met Henri Piette's children. The kids became close, bonding over sleepovers, movies, meals, and time spent on Piette's trampoline.

Piette first molested McGinnis at one of these sleepovers. She was nine. At first, she thought it was a "bad dream," but soon she realized that it was far too detailed to have been a dream. R. Vol. II at 188. Gayla had not believed McGinnis when she was previously molested by her half-brother, so McGinnis did not tell anyone about what Piette did.

McGinnis was not Piette's only victim in Springfield. One of Piette's sons, Tobias Piette, testified that he saw Piette molest several other children while they lived there. One day, he walked in on Piette giving an eight-year-old girl a shower and touching her vagina. Another time, he saw Piette giving a different young girl a driving lesson; he groped her butt while she sat on his lap.

As the McGinnis and Piette children got to know each other better, so did Gayla McGinnis and Henri Piette. They discussed Gayla's interest in religion and the Church of Jesus Christ of Latter-day Saints. Piette gradually drove Gayla away from her husband Michael, who did not share her interest in these topics and was often away from home. Soon, Michael left Gayla and the children entirely. "Almost

3

immediately," McGinnis's brother testified, it was as if Piette "had stepped into [Michael's] shoes." *Id.* at 489.

But Piette ran a very different kind of home. He read Bible passages to the children constantly. He encouraged Gayla to physically discipline the children. He started separating the children and imposed something "almost like a hierarchy system." *Id.* He beat Gayla "countless" times. *Id.* at 634. He also beat the children. After one of Piette's beatings drew the attention of authorities, Piette convinced Gayla that she would be blamed for it, and they took the family on the road. They moved on an almost daily basis, passing through Arizona, Oregon, Utah, California, Montana, Missouri, Texas, Oklahoma, and Guatemala. Piette forced the others to beg for money. They lived in a tent. Piette gave McGinnis beer and molested her daily.

Piette, Gayla, and the children settled in Wagoner, Oklahoma. There, Piette escalated his physical, sexual, and psychological abuse. He hit the children with two-by-fours when they said "hanged" instead of "hung." *Id.* at 212. He punched Gayla in the face. He raped McGinnis. She was eleven. Finally, Gayla escaped to her mother's home in Independence, Missouri, and took her children with her. A few weeks later, Piette went to Independence and took them back.

When they returned to Wagoner, Piette addressed his "sin" with McGinnis by marrying her in a secret ceremony officiated by Piette's son Tobias. *Id.* at 219. Piette also married Gayla around this time. The sexual abuse of McGinnis continued unabated. Piette performed oral sex on McGinnis and penetrated her vagina daily

4

with his penis and fingers.  She was twelve.  After a run-in with Child Protective Services, McGinnis and her family landed in a domestic violence shelter in Poteau, Oklahoma, away from Piette.  McGinnis briefly attended middle school in Poteau.

On January 31, 1997, McGinnis went to school in Poteau and did not come home.  Piette visited her on the playground that day.  He told McGinnis that he loved her and that he would reunite their family.  He told her to look for "signs."  *Id.* at 234.  Later that day, McGinnis noticed a sombrero and a poncho inside a school building; she recognized them from a trip to Mexico with Piette.  She ran outside the school and saw Tobias Piette in a truck; he took her to Tulsa, where they met up with Piette and Piette's other children.  When McGinnis asked about the rest of her family, Piette told her there was not enough time to get her brothers and that Gayla "wasn't coming back."  *Id.* at 240.  He introduced McGinnis to his children as "their new mother."  *Id.*  McGinnis was horrified.

McGinnis did not attend school after the sixth grade.  Piette moved McGinnis and his children around the country several times, taking advantage of benefits provided by the Church of Jesus Christ of Latter-day Saints, and avoiding detection by using false names and changing McGinnis's appearance.[1]  Everyone was drilled on what to say if people started asking questions.  Piette forced McGinnis to write letters to relatives, the media, and law enforcement, saying that she ran away from

---

[1] Eventually, McGinnis legally changed her name to Stephanie Reed, one of the aliases Piette forced her to adopt.

her "crazy" mother and "no good" family.  *Id.* at 263.  If she misspelled a word she was hit.  In reality, Gayla diligently searched for McGinnis.

Piette continued subjecting McGinnis to constant physical and sexual violence. He raped her "[t]hree times a day, maybe more."  *Id.* at 249.  Shortly before McGinnis turned thirteen, while living in Oklahoma City, she became pregnant for the first time.  She had a miscarriage and Piette told her to flush it down the toilet. Piette started giving McGinnis crack cocaine and beat her more frequently.  Then, while living in Idaho, McGinnis became pregnant again.  This time, she was fourteen. Piette moved the family to Mexico to avoid questions about her pregnancy, but when Piette brought McGinnis to the hospital the doctors said it was too soon to deliver the baby.  Piette disagreed.  He used a pocketknife to deliver the baby on the floor of a van.  At the time, they were "living in an abandoned trailer that was on a piece of land that had no electricity, no water, had holes in the floors and was infested with bed bugs."  *Id.* at 276.

Over the next sixteen years, Piette moved the family around Mexico and Guatemala, rarely spending more than a few months in any one location, though they would take occasional trips back to the United States.  McGinnis delivered eight more of Piette's children.  These children did not go to school, socialize, or even learn how to read.  They were isolated from others.  Piette tried to prevent them from learning where they were living.  The children were also neglected.  One of the boys had a single pair of shorts that he kept on his body with a rope.  One of the girls almost drowned in a bucket of water.  Piette hung her upside down to shake the water

out and she recovered.  The family's lifestyle consisted of "begging on the streets and living from place to place."  *Id.* at 340.  Sometimes, McGinnis sold ice cream and other foods.  Other times, Piette would make racist comments to provoke the locals into fighting McGinnis for money.  Whatever the source, all money went to Piette. He spent it on drugs and alcohol, which he also abused.

Years passed, and Piette's brutality continued.  McGinnis testified that there was never a time that Piette was not beating her.  He would sometimes tie McGinnis to a bed or chain her to a pole for days.  She testified that she has scars all over her face, has had both her arms broken, has been stabbed and shot, suffers chronic pain, and needed throat surgery to be able to speak.  Piette would also terrorize their children, hitting them with two-by-fours, bats, rocks, pans, pickaxes, glass bottles, fruit, and "[a]nything that was in reach."  *Id.* at 119.  He would beat the children to the point of unconsciousness and then tell them that he loved them.  "[I]t just surprised me how close I can get to dying without dying," McGinnis's firstborn testified.  *Id.* at 127.

Piette also started molesting the children McGinnis delivered.  Ma.P., Piette's first daughter with McGinnis, testified at trial that when she was around five years old, Piette asked her to stand against the wall, pull down her underwear, and show him her vagina.  Although McGinnis did not know exactly what was happening with her daughter, she was suspicious.  Piette complimented and touched Ma.P.'s vagina more frequently as she got older.  He made Ma.P. dance naked and gave her alcohol and drugs while he molested her.  He put his mouth on her chest and her vagina.  He

7

made her touch and put her mouth on his penis, and he ejaculated in her mouth. When she was seven or eight years old, Piette started putting objects in Ma.P.'s vagina, such as frozen hot dogs and drumsticks. He would punish her by cutting up chilis and rubbing chili juice on his fingers, then placing them in her vagina. Piette also started putting his penis in her vagina. When she resisted, Piette told her he would either molest her or one of her sisters. One time, Ma.P. saw Piette molesting her younger sister, A.P., who was crying; Ma.P. was forced to put her mouth on Piette's penis so he would leave A.P. alone.

A.P. also testified about Piette's sexual abuse. According to A.P., Piette started touching her vagina when she was around seven years old and continued to molest her every few days. She often woke up to Piette touching her vagina. Piette forced A.P. to masturbate his penis and ejaculated in her mouth. One time, A.P. and her younger brother saw Piette performing oral sex on Ma.P. A.P. and Ma.P. never talked about their shared experience of sexual trauma and abuse.

Sometimes, McGinnis would travel back into the United States by herself to beg for money. Other times, Piette was incarcerated, and McGinnis helped him get out of jail. McGinnis also purchased several guns and carried a gun at times, although she testified it belonged to Piette. But Piette told McGinnis that he would kill the children, and then her, if she ever left him. He also told her that, if she got the police involved, nobody would ever believe her. That he would kill her. That her family did not want her back. That "he was the only one that would ever care for" her. *Id.* at 298. And that she "was to do exactly what he told [her] to do or else." *Id.*

8

On direct examination, McGinnis defined "or else" as Piette killing her and her children.  *Id.*  McGinnis further testified that she did not take advantage of any potential opportunity to harm Piette because she "knew that if [she] didn't kill him with the first shot or knife stab, if there was any way that he would survive, he would kill [her] and every one of [her] children."  *Id.* at 435–36.  Even had she managed to kill him, she testified that she believed she would be imprisoned for life and her children all sold into slavery.  On the other hand, Piette introduced testimony from his father that he and McGinnis appeared to have a "very happy family."  *Id.* at 985.

Notwithstanding the fear that Piette's threats instilled in her, McGinnis made several attempts to escape.  Once, alone with her children in an Arizona motel room, she called a women's crisis shelter, but Piette returned before the shelter could assist her.  Another time, McGinnis took her children to Piette's son Mikey's house.  Piette quickly arrived, dragged McGinnis out by her hair, and beat her.  One of Piette's children with McGinnis managed to escape and, although a knife fight ensued, Piette did not kill him.

In 2016, McGinnis saved up $150 over the course of several months—hiding it by a hill to avoid Piette's detection—and waited until Piette, who had been in and out of rehab, was passed out drunk.  Then she took her children, found a taxi, and hid in a nearby town.  McGinnis and eight of her children—one of her sons had already escaped—made their way to an American Consulate.  They returned to the United States and settled in Kansas City, Missouri.

9

**b.**

In 2017, Piette was indicted in the Eastern District of Oklahoma and charged with kidnapping under 18 U.S.C. §§ 1201(a)(1) and 1201(g), and traveling with intent to engage in sexual relations with a juvenile under 18 U.S.C. § 2423(b).  A jury found Piette guilty of both counts.  Four legal issues relevant to this appeal emerged in the proceedings before the district court.

First, the government sought to admit evidence that Piette molested his daughters with McGinnis as well as an unrelated girl in Springfield some years before meeting McGinnis ("the molestation evidence").  The government argued that the molestation evidence could be admitted as res gestae—meaning inextricably intertwined with the charged conduct—and, alternatively, under either Federal Rule of Evidence 404(b), covering other acts evidence, or Rule 414, covering child molestation evidence.  Piette opposed.  At a pretrial conference, the district court ruled that the molestation evidence came in (1) as res gestae "because it goes to the issue of consent, and it is inextricably intertwined with the charged crimes"; (2)  under Rule 404(b) because it went "to the issues of both motive and plan"; and (3)  under Rule 414 as permissible propensity evidence.  *Id.* at 41–42.  The district court then turned to whether the evidence was more prejudicial than probative, saying only: "I still have to do a balancing test under [Federal Rule of Evidence] 403.  And I believe that the probative value of the evidence is certainly not substantially outweighed by the prejudicial effect."  *Id.* at 42.  The district court memorialized these evidentiary rulings in a brief order.  In that order, the court reiterated that the

10

molestation evidence could come in under Rule 404(b) "at least [to] show motive and plan." R. Vol. I at 321 (parentheses omitted).[2]  The order did not elaborate upon the court's Rule 403 analysis.  Halfway through trial, facing repeated objections, the district court restated its conclusory Rule 403 finding.

Second, Piette argued in pretrial briefing that the traveling-with-intent charge was untimely because any enactments purporting to extend the statute of limitations had an impermissible retroactive effect.  The district court ruled that because the original statute of limitations had not already expired when Congress acted, the legislature validly extended a live charging period, rendering Piette's 2017 indictment timely.  The district court thus endorsed "the theory that such amendments may be applied retroactively to extend a filing period for charges that were still viable at the time of the amendment."  *Id.* at 151; *cf. Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 950 (1997) ("[E]xtending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action.").  Piette renewed his retroactivity argument in an oral motion for acquittal at the conclusion of the government's case-in-chief, which the district court denied.

---

[2] At trial, the court gave a limiting instruction several times when it felt that Rule 404(b) evidence was being presented.  Usually, the court told the jurors that they should consider the evidence not just for motive and plan, but also for intent and knowledge.  Subsequently, preparation replaced knowledge.  Later, all five purposes were in play.  By the end of the trial, the court was communicating the limiting instruction only by alluding to its existence, leaving it unclear which Rule 404(b) purposes were being invoked.

Third, the district court noted before trial that the government would likely try to prove that McGinnis's "kidnapping continued uninterrupted" from 1997 through her 2016 escape.  R. Vol. I at 147.  That was because any "break" within that twenty-year span would start the kidnapping count's five-year statute of limitations.  *Id.*  If the statute of limitations expired before Piette's 2017 indictment, the charge would not be timely.  As a result, the court anticipated sending a special interrogatory to the jury.  At trial, the court did just that, denying a motion for acquittal on this basis and providing the jury the following instructions.

### DURATION OF KIDNAPPING

The government contends that the kidnapping alleged in Count 1 extended from January 1997 until July 28, 2016.

Under the law, if the victim of a kidnapping is no longer held against her will, the kidnapping is over.

As one of the defenses, [Piette] contends Rosalyn McGinnis was (if at all), at a date earlier than July 28, 2016, no longer held against her will.

[Piette] must prove this contention by a preponderance of the evidence, which is defined as "more likely than not."

On the verdict form, <u>only</u> if you have found the defendant guilty as to Count 1, you will be asked to determine if Rosalyn McGinnis was no longer held against her will at an earlier date, and what that date was.  This will aid the court in making a separate legal determination in regard to this case.

In determining if Rosalyn McGuinness [sic] was continually held against her will (physically and/or psychologically), you should consider all the testimony you have heard in the case.

*Id.* at 372.  The verdict form reflected these instructions.  It told the jury that, should it find Piette guilty of kidnapping, it must answer an additional yes/no question: "Do you find, by a preponderance of the evidence, that Rosalyn McGuinness [sic] was no longer held against her will on a date earlier than July 28, 2016?"  *Id.* at 388.  If the answer was yes, jurors were asked to specify the date and/or the year.  The jury

ultimately found Piette guilty of kidnapping and did not find, pursuant to the district court's instructions, that Piette demonstrated by a preponderance of the evidence that McGinnis was no longer held against her will prior to July 28, 2016. Piette did not argue below that these jury instructions created a statute of limitations problem.

Finally, Piette claims that he sought to represent himself in a letter to the district court in November 2019, and then again at the start of sentencing in February 2020. In his letter, Piette asked the court to "terminate the services" of attorney Warren Gotcher and investigator Eric Cullen because of "Absolute 'In[e]ffective Assist[a]nce of Counsel.'" *Id.* at 399 (emphasis omitted). On February 20, 2020, before proceeding to sentencing, the district court addressed Piette's pending motion to withdraw his trial counsel. Gotcher stated that he had no objection to Piette's motion. Gotcher next double-checked with Piette that Piette still wanted Gotcher to withdraw. Piette said "Yes." R. Vol. II at 1107. Gotcher indicated that he had an "obligation to stay through sentencing" and assist Piette in filing a notice of appeal; he asked the district court to delay granting the motion until those tasks were complete. *Id.* Agreeing, the district court granted the motion "to be in effect subsequent to this sentencing hearing." *Id.* at 1108. This exchange followed:

> The Court: I think it is important that trial counsel, who has been with the case since—well, not day one because this is Mr. Piette's second appointed attorney, . . . be here through the sentencing hearing itself. So the Court directs that another attorney will be appointed by the Federal Public Defender's office to see Mr. Piette's case through appeal and that—and that is, unless, Mr. Piette wants to hire an attorney on his own.
>
> The Defendant: Are you saying—

13

The Court: No, no, you tell Mr. Gotcher.

(OFF THE RECORD DISCUSSION BETWEEN MR. GOTCHER AND THE DEFENDANT)

Mr. Gotcher: We are ready to go on, Your Honor.

The Court: All right.  Is that acceptable, Mr. Piette?

The Defendant: Yes, sir, yes.

*Id.* at 1108–09.

The district court entered hundreds of pages of Piette's handwritten letters as an exhibit, noting that they contextualized Piette's request to withdraw Gotcher.  As the court put it: "At some points in time Mr. Piette expressed vast disagreement with counsel and at other times Mr. Piette thought Mr. Gotcher was the best thing since sliced bread."  *Id.* at 1109.  The district court decided to "err on the side of giving Mr. Piette new counsel for appeal purposes."  *Id.*  Sentencing ensued.

The district court ruled on Gotcher's objections to the Presentence Report and Gotcher argued in support of his written motion for a downward variance, which the court denied.  After hearing from the government, the court invited Piette to speak.  He did so for "nearly thirty transcript pages."  Aple. Br. at 46; *see also* R. Vol. II at 1119–46.  He maintained his innocence, touted a work ethic so strong that employers have called him a "human backhoe," explained that badgers are "meaner than hell," and bragged about how popular his family's dairy products were in Mexico.  R. Vol. II at 1141, 1144.  The court sentenced Piette to life imprisonment on the kidnapping

conviction and 360 months' imprisonment on the traveling-with-intent conviction. Piette appealed.

## II.

We begin with whether the molestation evidence was properly admitted under any of the three theories accepted by the district court: res gestae, Rule 404(b), and Rule 414. The term "molestation evidence," as used in Piette's appeal, encompasses testimony that Piette sexually abused two of the daughters he had with McGinnis and an unrelated girl in Springfield before he met McGinnis. *See* Aplt. Br. at 14. Piette's daughters, known as Ma.P. and A.P. at trial, testified at length about their own abuse, while Piette's son Tobias testified briefly about the Springfield girl. On appeal, Piette argues that both his convictions should be reversed because the district court improperly admitted this highly prejudicial evidence. We disagree. The intrinsic molestation evidence about Piette's daughters was admissible as res gestae, while the extrinsic molestation evidence concerning the Springfield girl, even if admitted in error, likely had no effect on the verdict. We do not reach Rule 404(b) or Rule 414. Although the district court's conclusory, one-sentence Rule 403 prejudice inquiry was deficient, our review of the case suggests that it was not an abuse of discretion to admit the molestation evidence under Rule 403. *See United States v. Lazcano-Villalobos*, 175 F.3d 838, 846 (10th Cir. 1999) ("We have consistently upheld implicit Rule 403 determinations when the determinations are supported by the record."). Piette's convictions withstand his evidentiary arguments.

**a.**

Piette appeals the molestation evidence's admission on all three grounds relied upon by the district court, contending that his "trial was infected by repulsive other-act molestation evidence that created an unacceptable risk that the jury would convict based on emotion instead of dispassionate decision-making." Aplt. Br. at 25. Piette stresses that he mounted a "targeted" and "technical but effective" defense to each charge at trial, only disputing the consent element of the kidnapping charge and the intent element of the traveling-with-intent charge. Reply Br. at 14. Because this significantly reduced the number of disputed facts at trial, Piette suggests the molestation evidence "added no probative value to the government's case," Aplt. Br. at 4, and merely inflamed the jury.

On res gestae, Piette argues that the molestation evidence was irrelevant to proving his intent or McGinnis's lack of consent, thus falling short of the "inextricably intertwined" standard. *Id.* at 31. The government responds that the evidence was "part and parcel of his scheme to maintain control of his family and enforce his rules of begging, service and secrecy." Aple. Br. at 22. On Rule 404(b), Piette argues that the molestation evidence fails to show "motive" because the notion that Piette's motive in kidnapping McGinnis was to molest their future children is simply the "forbidden character-based propensity inference repackaged." Aplt. Br. at 33. Likewise, Piette argues that the molestation evidence fails to show any "plan" because it is unrelated to the charged offenses, leaving "no non-propensity purpose." *Id.* at 35. The government counters that Piette was "motivated to produce children

16

who he could control to meet his sexual desires," and that kidnapping McGinnis "was preparation for his plan to create his own home where he could meet his perverse sexual needs" without drawing attention.  Aple. Br. at 23–24.  Finally, turning to Rule 414, Piette argues that the district court failed to conduct a non-conclusory prejudicial balancing analysis and that the molestation evidence was barely probative but highly prejudicial.  The government replies that its admission was a reasonable application of Rule 414.

We review a district court's evidentiary rulings for abuse of discretion.  *United States v. Sturm*, 673 F.3d 1274, 1285 (10th Cir. 2012).  We may uphold them "on any ground supported by the record."  *Id.* at 1286.  Reversal requires "a distinct showing that [the ruling] was based on a clearly erroneous finding of fact, or an erroneous conclusion of law or manifests a clear error in judgment."  *United States v. Lozado*, 776 F.3d 1119, 1124 (10th Cir. 2015) (quoting *United States v. Smalls*, 605 F.3d 765, 773 (10th Cir. 2010)).  "When a district court has improperly admitted or excluded evidence, we reverse 'only if the error affects a substantial right of the party.'"  *Burke v. Regalado*, 935 F.3d 960, 1011 (10th Cir. 2019) (quoting Fed. R. Evid. 103(a)).  The question is whether the error was harmless.  *See id.*  Harmless error analysis looks at "the record as a whole."  *Id.* (quoting *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 659 (10th Cir. 2016)).  It asks whether the "verdict more probably than not was unaffected by the error."  *Id.* (quoting *Abraham v. BP Am. Prod. Co.*, 685 F.3d 1196, 1202 (10th Cir. 2012)).

17

**b.**

Evidence of other bad acts may be extrinsic or intrinsic depending on its relationship to the charged offense.  Intrinsic other acts evidence encompasses conduct "inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and incomplete without mention of the prior act." *United States v. Ford*, 613 F.3d 1263, 1267 (10th Cir. 2010) (quoting *United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir. 1994)).  This is known as res gestae, which the district court invoked to admit much of the molestation evidence.  We have also described this kind of evidence as "part and parcel of the proof of the offense . . . charged in the indictment." *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995) (quoting *United States v. Gano*, 560 F.2d 990, 994 (10th Cir. 1977)).  Res gestae evidence is not subject to Rule 404(b), but it remains subject to Rule 403 balancing and "will be inadmissible . . . if it has no proper probative value." *United States v. Irving*, 665 F.3d 1184, 1215 (10th Cir. 2011) (Hartz, J., concurring).  In this case, a res gestae theory can apply, at most, to the subset of the molestation evidence concerning Piette's daughters.  The Springfield girl incident took place before McGinnis entered the picture and cannot come in as "part and parcel" of her kidnapping.  *See Kimball*, 73 F.3d at 272.

In *United States v. Ford*, the incarcerated defendant and another inmate escaped from a Kansas prison with the aid of the defendant's romantic partner.  613 F.3d at 1266.  The partner, a former corrections officer, stole several guns, cut through several prison fences, and rented a getaway car.  *Id.*  The trio drove the car to

18

New Mexico, where they sought a new vehicle to avoid detection. *Id.* They were arrested while scoping out a local apartment complex for a car to steal, and the defendant was charged as a felon in possession, a fugitive in possession, and for possession of stolen firearms. *Id.* at 1265–66. On appeal, the defendant challenged the trial judge's admission of evidence concerning his prison escape as res gestae. *Id.* at 1267. We rejected the defendant's arguments, concluding that the "Kansas escape could not be separated from the charged crimes." *Id.* at 1268. We reasoned that his "flight began with the escape, which explained his need for weapons and the circumstances of his arrest just two and a half days later." *Id.* The evidence was "undoubtedly *res gestae*—intrinsic evidence inextricably connected to the charged crimes." *Id.*

Here, the district court properly invoked res gestae to permit the government to paint a complete picture of Piette's other simultaneous domestic molestation conduct. Like in *Ford*, it is difficult to separate Piette's treatment of his daughters from his treatment of McGinnis, especially when McGinnis's consent was disputed at trial. The government used the molestation evidence to reveal the nature of Piette's household and convince the jury that McGinnis never consented to Piette's treatment. *See Johnson*, 42 F.3d at 1316 ("An uncharged act may not be extrinsic if . . . it was part of the scheme for which a defendant is being prosecuted."). The evidence was properly admitted as res gestae, and it is relevant to the finding of fact required to rebut Piette's statute of limitations argument on the kidnapping charge.

19

In his briefing, Piette deletes the references to the abuse of his daughters from the government's account of his behavior, suggesting that such a redlined version "would not have left analytical or temporal gaps in the government's case or left the jury confused," so the res gestae finding was improper.  Reply Br. at 5. Notwithstanding the logical consistency of Piette's redacted summary, res gestae was still a valid ground for admission because the resulting testimony would have been "incomplete" without the evidence of Piette's abuse of his daughters.  *See Ford*, 613 F.3d at 1267.  It was crucial for the jury to hear from Piette's daughters about the extent of his molestation so it could fully understand their living situation, his conduct, his intentions, and McGinnis's perspective, which they were required to evaluate.

Finding that the intrinsic molestation evidence could come in as res gestae still leaves Rule 403 balancing.  Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403. Piette focuses his challenge on the "unfair prejudice" aspect of Rule 403.  Typically, we review a district court's Rule 403 analysis to assess whether it constituted an abuse of discretion warranting reversal.  *See, e.g.*, *United States v. Merritt*, 961 F.3d 1105, 1115–16 (10th Cir. 2020).  Here, however, the district court's Rule 403 analysis was wholly conclusory.  Ruling on the molestation evidence orally, the district court stated just: "I believe that the probative value of the evidence is

certainly not substantially outweighed by the prejudicial effect." R. Vol. II at 42. The district court's written order had nothing more to say on the matter. That leaves little to review. However, we may supplement the district court's Rule 403 determination on appeal to assess whether its conclusion was an abuse of discretion. *See United States v. Magnan*, 756 F. App'x 807, 821 (10th Cir. 2018) (unpublished); *see also Lazcano-Villalobos*, 175 F.3d at 846–47.[3] Considering Piette's arguments about minimal probative value due to limited areas of dispute at trial, and maximal prejudice because of the depravity of the molestation evidence, we conclude that Piette understates the evidence's probative value and overstates its prejudicial effect.

First, jurors could reasonably find that the molestation evidence made a fact of consequence—either McGinnis's consent, for the kidnapping charge, or Piette's intent, for the traveling-with-intent charge—significantly more or less likely than it was without that evidence. *See* Fed. R. Evid. 401 (relevant evidence has "any tendency" to make a "fact . . . of consequence in determining the action" "more or less probable"); *see also United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007) (the relevancy requirement sets a "very low" bar). For example, by raising McGinnis's consent as a defense, Piette was asking the jury to understand her perspective. The molestation evidence helped the jury do so. Piette's argument that McGinnis was unaware of her daughters' molestation is irrelevant to whether the evidence, if believed, made the proposition that she consented less likely. It did, so it

---

[3] Unpublished cases are not binding precedent, but we consider them for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

was relevant.  The same is true with respect to Piette's defense to the traveling-with-intent charge.  Jurors may have viewed Piette's later abuse of McGinnis's daughters as making it more likely he had the requisite intent when he traveled with McGinnis.

Second, while graphic testimony that Piette molested the daughters he had with McGinnis may have affected the jury, we do not think that any resulting prejudice was particularly unfair or that it substantially outweighed the evidence's probative value with respect to Piette's principal defenses—or, at least, not so much as to render the district court's decision an abuse of discretion.  Piette's argument that jurors may be unfairly inflamed by child sexual predators is somewhat self-defeating.  Even before hearing from Ma.P. and A.P., the jurors were already dealing with an individual charged with kidnapping his preteen stepdaughter-wife, raping her three times a day for years, and forcing her to bear nine of his children.  The district court could have reasonably concluded that any prejudicial effect probably would have already happened.  Even defense counsel started his opening statement at trial by saying: "Ladies and gentlemen of the jury, [the government's] opening statement, it sounds real bad, it sounds awful."  R. Vol. II at 98.  In light of this, the district court could have also recognized, as a countervailing consideration, that it was important for the jury to hear the molestation evidence.  As we have explained, the evidence served a critical purpose: it helped the jury contextualize McGinnis's situation and assess whether Piette's defenses were meritorious.  Because the district court could have reasonably concluded that the danger of unfair prejudice did not outweigh the molestation evidence's probative value, it was not an abuse of

discretion to admit the subset of the molestation evidence concerning Piette's daughters, notwithstanding Rule 403.

### c.

The government recognized at trial that Tobias's testimony about Piette molesting the Springfield girl was inadmissible as res gestae because it preceded Piette's time with McGinnis.  In other words, it was extrinsic bad acts evidence.  However, the government argued that Rules 404(b) and 414 were alternative bases for admission.  We hold that even if the district court erred by admitting this subset of the molestation evidence under either rule, any error was harmless.

Evidence law generally abhors the propensity inference—the notion that a person did something just because he has a corresponding character or has done similar things before.  *See* Fed. R. Evid. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *see also Michelson v. United States*, 335 U.S. 469, 475–76 (1948).  However, Rule 404(b) carves a purpose-based exception that allows evidence of other bad acts to be admitted for non-propensity purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "We 'consider four factors in weighing the admissibility of evidence under Rule 404(b): (1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) [that] a limiting instruction is given if

the defendant so requests.'" *United States v. Burgess*, 576 F.3d 1078, 1098 (10th Cir.

2009) (quoting *United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006)).  This

inquiry incorporates the Rule 401 relevancy and Rule 403 balancing inquiries at steps

two and three, respectively.  *See United States v. Tan*, 254 F.3d 1204, 1207 (10th Cir.

2001).

Another exception to the general inclination against propensity evidence is

Rule 414, which embraces the propensity inference in a limited class of cases.  It

states that, "[i]n a criminal case in which a defendant is accused of child molestation,

the court may admit evidence that the defendant committed any other child

molestation . . . on any matter to which it is relevant."  Fed. R. Evid. 414(a).  There

are three "threshold requirements" for admitting evidence pursuant to Rule 414:

"(1) the defendant is accused of a crime involving sexual assault or child molestation,

(2) the evidence proffered is evidence of the defendant's commission of another

offense or offenses involving sexual assault or child molestation, and (3) the

evidence is relevant."  *United States v. Benally*, 500 F.3d 1085, 1090 (10th Cir.

2007).  But that is not the end of the road.  We subject Rule 414 evidence to a

particular breed of Rule 403 balancing and insist that "the district court has an

obligation 'to fully evaluate the proffered . . . evidence and make a clear record of the

reasoning behind its findings.'"  *Id.* at 1091 (omission in original) (quoting *United

States v. Guardia*, 135 F.3d 1326, 1331 (10th Cir. 1998)).[4]

---

[4] This specialized Rule 403 inquiry has two stages.  First, the district court
must consider the four *Enjady* factors: "(1) how clearly the prior act has been proved;

Even if the district court erred by admitting the subset of the molestation evidence concerning the Springfield girl under Rules 404(b) or 414, we think that any such error was harmless. Reviewing the record in its entirety makes clear that testimony about the Springfield incident occupied only a few moments in a weeklong trial packed with graphic, disturbing evidence of Piette's behavior, often in the form of lengthy firsthand accounts from survivors like McGinnis, Ma.P., and A.P. Tobias Piette's testimony about encountering Piette and the Springfield girl in the shower before meeting McGinnis pales in comparison to the breadth, depth, and detail of the remaining sexual molestation evidence the jury heard in this case. It is also notable that the jury received evidence of inappropriate conduct with minors unrelated to McGinnis, her children, or the Springfield girl, which Piette does not challenge on appeal, such as the driving lesson Tobias testified about. Based on our review of the questions the jury was asked to decide, and the evidence the government presented to help it decide them, we think it is more likely than not the case, *see Burke*, 935 F.3d at 1011, that the subset of the molestation evidence involving the Springfield girl, even if admitted in error, had no effect on the jury's verdict on either count. Because

---

(2) how probative the evidence is of the material fact it is admitted to prove; (3) how seriously disputed the material fact is; and (4) whether the government can avail itself of any less prejudicial evidence." *United States v. Perrault*, 995 F.3d 748, 765–66 (10th Cir. 2021) (footnotes omitted); *see also United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998). The district court must next weigh the *Enjady* factors against three additional factors: "(1) how likely [it is that] such evidence will contribute to an improperly-based jury verdict; (2) the extent to which such evidence will distract the jury from the central issues of the trial; and (3) how time consuming it will be to prove the prior conduct." *Perrault*, 995 F.3d at 766.

Piette fails to demonstrate that the admission of this subset of the molestation evidence affected the case, we need not consider whether the evidence was properly admitted under Rules 404(b) or 414.

*  *  *

The molestation evidence concerning Piette's daughters was properly admitted as res gestae, and any error in admitting the remaining molestation evidence involving the Springfield girl was harmless. The district court's conclusory Rule 403 assessment does not require reversal because, on this record, it was not an abuse of discretion to find that the evidence's probative value was not outweighed by its prejudicial effect. *See Lazcano-Villalobos*, 175 F.3d at 846–47.

## III.

Next, we consider Piette's argument that the traveling-with-intent charge was brought outside the statute of limitations because the enactments purporting to extend the then-unexpired charging period had an impermissible retroactive effect. We review the district court's "interpretation and application" of statutes of limitations de novo. *Barnes v. United States*, 776 F.3d 1134, 1139 (10th Cir. 2015). We likewise review the retroactivity of a statute de novo. *See Valdez-Sanchez v. Gonzales*, 485 F.3d 1084, 1088 (10th Cir. 2007). For the following reasons, we reject Piette's argument and affirm his traveling-with-intent conviction.

The general federal statute of limitations for noncapital offenses is five years. *See* 18 U.S.C. § 3282(a). But Congress has made several modifications to that charging period for sexual offenses against minors. As a result, the statutes of

limitations that apply to Piette's traveling-with-intent charge have gone through a series of changes in the past few decades, as summarized below.

| Act | Year | Code | Charging Period |
|-----|------|------|-----------------|
| Victims of Child Abuse Act | 1990 | § 3509(k) | Until the child turned twenty-five. |
| Violent Crime Control and Law Enforcement Act | 1994 | § 3283 | Until the child turned twenty-five (recodification). |
| Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act | 2003 | § 3283 | The life of the child. |
| Violence Against Women and Department of Justice Reauthorization Act | 2006 | § 3283 | The life of the child or ten years after the offense (whichever is longer). |
| Adam Walsh Child Protection and Safety Act | 2006 | § 3299 | Any time. |

Today, both §§ 3283 and 3299 cover Piette's traveling-with-intent charge. Piette argues that the statute of limitations on that charge began to run, at the latest, on May 14, 2000, when McGinnis turned sixteen. *See id.* § 2243(a) (criminalizing sexual acts with minors between twelve and sixteen by persons at least four years older). At that point, the statute of limitations in effect—§ 3283 (1994)—would expire on McGinnis's twenty-fifth birthday, which was May 14, 2009. Piette was ultimately charged in December 2017. Before the limitations period expired, however, Congress made the 2003 and 2006 changes outlined above, which would render Piette's indictment timely if applied to him.

The issue is whether the new statutes of limitations validly extended the charging period for Piette's pre-enactment conduct—that is, whether they apply

27

retroactively.  Piette argues that the test outlined by the Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994), and *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006), for assessing a statute's retroactivity requires reversal and renders his indictment untimely.  Piette is not the first defendant to encounter this problem or make this argument.  Several courts have discussed this exact question either on the merits or in the context of an ineffective assistance of counsel claim.  *See Weingarten v. United States*, 865 F.3d 48, 54–58 (2d Cir. 2017) (ineffective assistance); *United States v. Miller*, 911 F.3d 638, 642–46 (1st Cir. 2018) (ineffective assistance); *United States v. Nader*, 425 F. Supp. 3d 619, 624–32 (E.D. Va. 2019) (merits); *United States v. Maxwell*, 534 F. Supp. 3d 299, 314–16 (S.D.N.Y. 2021) (merits).  These cases inform our determination whether the relevant statutes of limitations apply retroactively, which appears to be a question of first impression in this circuit.

At the outset, it is important to clarify the *Landgraf* framework that guides our review.  Different circuits divide on the proper number of steps and their contents, but we tend to view *Landgraf* as a two-step process.  *See Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1282–83 (10th Cir. 2010).  First, we ask "whether Congress has expressly prescribed the proper reach" of the statute.  *Id.* at 1282.  If so, we follow Congress's lead.  If not, we proceed to the second step, asking "whether applying the statute to the events at issue would have retroactive effects." *Id.*  The Supreme Court instructs that "[s]tatutes are disfavored as retroactive when their application 'would impair rights a party possessed when he acted, increase a

28

party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Fernandez-Vargas*, 548 U.S. at 37 (quoting *Landgraf*, 511 U.S. at 280). If we find a retroactive effect, "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Landgraf*, 511 U.S. at 280.

Before proceeding, we note that Piette is not making an Ex Post Facto Clause argument. *See* U.S. Const. art. I, § 3, cl. 9. Several circuits have analyzed this exact issue under that rubric, as opposed to *Landgraf* retroactivity, and declined to find a violation of the Ex Post Facto Clause where the amended statute of limitations merely extended, as opposed to revived, a charging period. *See United States v. Chief*, 438 F.3d 920, 924–25 (9th Cir. 2006); *United States v. Jeffries*, 405 F.3d 682, 685 (8th Cir. 2005).

At *Landgraf*'s first step, we look for an express indication of the statutes' temporal reach. The argument on the government's side is that the statutes' introductory clauses—"[n]o statute of limitations that would otherwise preclude," for § 3283, and "[n]otwithstanding any other law," for § 3299—supply a "clear statement as to . . . retroactive effect." *Weingarten*, 865 F.3d at 55. A district court accepting this argument with respect to § 3283 reasoned that "[t]he statute's plain language unambiguously requires that it apply to prosecutions for offenses committed before the date of enactment . . . [because] it prevents the application of any statute of limitations that would otherwise apply to past conduct." *Maxwell*, 534 F. Supp. 3d at

315.  The same reasoning would apply to § 3299's "[n]otwithstanding any other law"

language, which casts an even wider net.

The counterargument is that this introductory language refers not to

retrospective application, but only to 18 U.S.C. § 3282(a), the general federal statute

of limitations.  On this reading, the statutes are merely supplanting the typical five-

year charging period.  The First Circuit has observed that when this introductory

language was first deployed in § 3283 in 1990, "the only existing limitations period

to which the language could have referred was the default limit set forth in section

3282."  *Miller*, 911 F.3d at 644.  Moreover, other statutes with the same kind of

introductory language contain explicit retroactivity provisions, so the government's

interpretation would render them redundant.

Piette's position points to the "express" requirement in *Landgraf*'s first step

and argues that it creates a high bar §§ 3283 and 3299 cannot meet.  *See Nader*, 425

F. Supp. 3d at 626 (referencing "the demanding standard for express prescription" in

the Fourth Circuit, which requires "language unequivocally delineating the time

period to which [statutes] apply").  It is indisputable that these statutes say nothing

express about retroactive application, so Piette has the stronger argument on this

point.  Although the introductory words of both statutes are not inconsistent with the

government's reading, they hardly constitute Congress expressly announcing a

retroactive effect.  A provision literally stating that a statute applies retroactively is

more so the kind of provision that *Landgraf* contemplates.  Congress can enact, and

30

has enacted, such provisions in the past.  But it did not do so in either § 3283 or § 3299.  We proceed to *Landgraf*'s second step.

At this step, we look for an impermissible retroactive effect, defined as an effect that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  *Landgraf*, 511 U.S. at 280.  If we find such an effect, we presume the statute does not apply retroactively unless there is "clear congressional intent favoring such a result."  *Id.*

On Piette's side, the Second Circuit has acknowledged "colorable arguments" that extending a live charging period would increase a defendant's liability for past conduct under *Landgraf*.  *See Weingarten*, 865 F.3d at 57.  But the court also acknowledged that the "vast weight of retroactivity decisions" support a distinction "between revoking a vested statute of limitations defense and extending a filing period for live claims."  *Id.*  The former would be a problem.  The latter would not. The First Circuit notes that the question's difficulty is compounded by the criminal context.  *See Miller*, 911 F.3d at 645.  After all, the Supreme Court has held that statutes of limitations should be "liberally interpreted in favor of repose."  *Toussie v. United States*, 397 U.S. 112, 115 (1970).  Accordingly, Piette relies heavily on *United States v. Gentile*, which held that a different statute of limitations extension was impermissibly retroactive under *Landgraf* because of that very principle.  235 F. Supp. 3d 649, 654 (D.N.J. 2017).  But other courts have distinguished *Gentile*, concluding that "the case law strongly supports the proposition that the distinction

31

between applying a statute that extends or eliminates a statute of limitations period to claims that were expired at the time of its enactment, and applying it to claims that were unexpired at the time of its enactment, is applicable to both civil and criminal statutes of limitations." *Nader*, 425 F. Supp. 3d at 630.

We agree. In 2003 and 2006, when these statutes of limitations were enacted, the original statute of limitations had not yet expired and Piette remained subject to prosecution for his past conduct insofar as he was susceptible to being charged for it. By extending the unexpired statute of limitations, Congress did not increase Piette's exposure to prosecution retroactively. It did not raise the penalty for the charged offense. It did not redefine the offense to make it easier to establish. It did not expose Piette to criminal prosecution anew. It merely altered the ongoing charging period for the conduct that had already exposed him to criminal prosecution. Piette was subject to indictment in 2002, before the statutes of limitations were extended, and he remained subject to indictment in 2007, once the changes were made. A dead charge was not resurrected, and the underlying nature of Piette's potential criminal liability remained the same. Ex Post Facto Clause cases echo both this conclusion and the import of this distinction in the broader retroactivity context. *See, e.g.*, *Jeffries*, 405 F.3d at 685. Piette's argument that he had the "statutory right," Aplt. Br. at 51 (quoting *Gentile*, 235 F. Supp. 3d at 654), to be free from prosecution after the original statute of limitations would have expired is misguided. Rather, it is Congress that had the right to modify a pending statute of limitations. Doing so does not violate retroactivity principles with respect to unexpired charging periods. We

conclude that neither statute of limitations had an impermissible retroactive effect because the relevant charging period had not yet expired. Extending an unexpired statute of limitations does not increase a defendant's exposure to prosecution. As a result, we need not consider Congressional intent. *Landgraf* is no basis for finding Piette's traveling-with-intent charge untimely, so we affirm the conviction.

## IV.

Finally, we consider Piette's argument that his kidnapping conviction should be reversed. We agree and reverse Piette's kidnapping conviction because the district court plainly erred by misallocating the burden of proof in its jury instructions and verdict form. We review the kidnapping jury instruction for plain error because Piette failed to object to it below. *See United States v. Antonio*, 936 F.3d 1117, 1126 (10th Cir. 2019). To prevail on plain error review, Piette must show that "(1) the district court erred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Muñoz*, 812 F.3d 809, 813 (10th Cir. 2016).

Our precedent clarifies how plain error analysis should be approached when a jury instruction is under review. First, an instruction amounts to error where, "considering the instructions as a whole, the jury has been misled." *United States v. Duran*, 133 F.3d 1324, 1330 (10th Cir. 1998). Second, an error is plain where it is "clear or obvious." *Muñoz*, 812 F.3d at 813 (quoting *Morales-Fernandez v. INS*, 418 F.3d 1116, 1124 (10th Cir. 2005)). Third, an instruction affects substantial rights if it

"concerns a principal element of the defense or an element of the crime." *Duran*, 133 F.3d at 1330.  Finally, "the fairness or integrity of a defendant's trial is seriously affected when the defendant has presented substantial evidence in support of an affirmative defense which has been undermined by an erroneous instruction." *Id.* (internal quotation marks omitted).

A criminal defendant generally bears the burden of proof on affirmative defenses, but Piette relies upon Supreme Court authority suggesting a consensus around the proposition that when a defendant contests whether the statute of limitations has run, the burden of proof on that issue shifts to the government.  Piette argues that the district court plainly erred by instructing the jury that he bore the burden to prove that McGinnis was no longer held against her will at a certain date, an argument that would have started the statute of limitations on the kidnapping charge.  To surmount the "extremely high hurdle" set by plain error review, *United States v. Walser*, 275 F.3d 981, 988 (10th Cir. 2001), Piette cites to *United States v. Duran*, a case involving the entrapment defense, which is subject to a similar burden-shifting treatment.  In *Duran*, we found reversible plain error under nearly identical procedural circumstances.  133 F.3d at 1329–34.

Starting with Supreme Court precedent, in *Musacchio v. United States* the Court held that the general federal criminal statute of limitations, 18 U.S.C. § 3282(a), cannot be raised on appeal unless it was argued below.  577 U.S. 237, 248 (2016).  The Court explained:

34

> [A] statute-of-limitations defense becomes part of a case only if the defendant puts the defense in issue.  When a defendant presses a limitations defense, the Government then bears the burden of establishing compliance with the statute of limitations by presenting evidence that the crime was committed within the limitations period or by establishing an exception to the limitations period.

*Id.* (emphasis added) (citing *United States v. Cook*, 17 Wall. 168, 179 (1872)).  We have previously relied upon this aspect of *Musacchio*.  *See United States v. DeLia*, 906 F.3d 1212, 1217 (10th Cir. 2018) (when defendant "affirmatively and timely" raises statute-of-limitations defense, burden shifts to government to establish compliance).  Other circuits agree.  *See United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997); *United States v. Ferris*, 807 F.2d 269, 272 (1st Cir. 1986).

The government relies upon *Smith v. United States*, 568 U.S. 106 (2013), which held that assigning the burden of proving withdrawal from a conspiracy to a defendant does not violate the Due Process Clause, to argue that it does not need to prove the nonexistence of affirmative defenses.  The district court also cited *Smith* in a pretrial order on this issue.  *See* R. Vol. I at 152 ("Commission of a federal crime within the statute-of-limitations period is not an element of the offense, and it is up to the defendant to raise the limitations defense.").  But, as Piette points out, the Court in *Smith* expressly stated "that the Government must prove the time of the conspiracy offense if a statute-of-limitations defense is raised."  568 U.S. at 113.  *Smith* is consistent with both *Musacchio* and Piette's theory of plain error.

It is therefore settled that if a defendant invokes the statute of limitations as a defense, the burden shifts to the government to establish the timing of the offense

35

beyond a reasonable doubt. Here, by instructing the jury to the contrary, the district court misled the jury and committed plain error. Significant daylight divides the jury's finding that Piette failed to show, by a preponderance of the evidence, that McGinnis was no longer held against her will at any point between 1997 and 2016, from the hypothetical finding Piette requests, and which we hold the Constitution requires: that the government proved, beyond a reasonable doubt, that McGinnis was continuously held against her will long enough to avoid any statute of limitations problem.

Turning to the remaining elements of plain error review, we observed in *Duran* that a jury instruction affects a defendant's substantial rights where it involves a "principal element[]" of a defense. 133 F.3d at 1333. Here, Piette predicated his entire defense to the kidnapping charge upon McGinnis's consent. Shifting the burden of proof to the government was a crucial aspect of the defense's efficacy. Also, the district court seemed to understand that whether McGinnis consented affected the viability of the kidnapping charge on the very statute of limitations grounds urged by Piette on appeal. *See* R. Vol. I at 372 ("This will aid the court in making a separate legal determination in regard to this case."). The district court's plain error regarding the burden of proof affected Piette's substantial rights because it involved a principal element of Piette's principal defense. *See Duran*, 133 F.3d at 1333.

Finally, we held in *Duran* that "[i]n light of the revered status of the beyond-a-reasonable-doubt standard in our criminal jurisprudence, a jury instruction that

36

allows a conviction where one important element may not have been found against the defendant by such a standard cannot be overlooked." *Id.* at 1334. That is exactly what happened here. The timing issue created by Piette's defense was not resolved beyond a reasonable doubt, as the Constitution requires. The district court plainly erred, so Piette's kidnapping conviction must be reversed.[5]

## V.

Last, because we affirm the traveling-with-intent conviction, we reach and reject Piette's constitutional challenge to his sentence for that conviction. Piette argues that, even if any of his convictions are not overturned, his sentence should be reversed because he was denied his Sixth Amendment right to represent himself at sentencing. A defendant seeking to represent himself must (1) "clearly and unequivocally" inform the court; (2) do so "timely and not for the purpose of delay"; (3) assure the court that he is waiving the right to counsel "knowingly and intelligently"; and (4) be "able and willing to abide by rules of procedure and courtroom protocol." *United States v. Simpson*, 845 F.3d 1039, 1046 (10th Cir. 2017) (quoting *United States v. Tucker*, 451 F.3d 1176, 1180 (10th Cir. 2006)). We

---

[5] In the closing moments of his rebuttal at oral argument, Piette's counsel suggested that "the fundamental nature of the burden of proof" requires reversing Piette's traveling-with-intent conviction because of the error that requires overturning his kidnapping conviction. Oral Arg. at 32:28–32:37. We do not consider issues that are first presented at oral argument. *See Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1269 n.9 (10th Cir. 2022).

review the district court's failure to allow Piette to represent himself at sentencing for abuse of discretion.[6]

Piette argues that the district court should have conducted a *Faretta* hearing and allowed him to represent himself at sentencing.  *See Faretta v. California*, 422 U.S. 806, 834–36 (1975); *see also United States v. Hansen*, 929 F.3d 1238, 1249 (10th Cir. 2019) (district courts often assess whether waivers of counsel are made knowingly and intelligently by conducting *Faretta* hearings).  The government responds that Piette failed to make a clear and unequivocal request to proceed pro se because of his "prolific and varied correspondence with the district court," which alternated between praising and lambasting his attorney, Warren Gotcher.  Aple. Br. at 46.  The government also observes that, at sentencing, Piette agreed to Gotcher representing him through filing an appeal, and that Piette spoke extensively on his own behalf.  We agree with the government.  Piette's theory fails on the clear-and-unequivocal prong for two principal reasons, and therefore the district court did not abuse its discretion.

---

[6] Both parties misstate the standard of review as de novo, which ignores the distinction we draw between requests for self-representation made before trial, reviewed de novo, and requests made after trial, reviewed for abuse of discretion. *See United States v. Beers*, 189 F.3d 1297, 1303 (10th Cir. 1999); *see also United States v. Estrada*, 25 F. App'x 814, 819–20 (10th Cir. 2002) (unpublished).  Piette focuses on demands for counsel's withdrawal made in November 2019 and renewed at sentencing in February 2020.  The jury reached its verdict on June 6, 2019, ending the trial months before Piette's first supposed request to proceed pro se.  Because any invocation of the right to self-representation would have occurred post-trial, we review for abuse of discretion.

First, it is neither clear nor unequivocal that Piette ever sought to represent himself—as opposed to merely requesting to withdraw Gotcher and receive new appointed counsel. Only the former endeavor would implicate Piette's constitutional right to self-representation. On appeal, Piette argues that his November 2019 letter did not request a replacement attorney, so we should view it as a request for self-representation. But, by the same reasoning, the letter said nothing about self-representation or proceeding pro se. Although it was preceded by a handwritten pleading, Piette submitted numerous such documents while represented by counsel. Similarly, Piette's request for case materials could have been an attempt to recover personal documents for his own records or for use by his next attorney, and not an implicit request for self-representation. Moreover, Piette based his request on Gotcher's ineffective assistance and not on any constitutional right to self-representation. In his response to Piette's motion, Gotcher requested that Piette "be appointed new counsel for appeal unless the defendant employs his own counsel, which Counsel advised the defendant is his right." R. Vol. I at 407. Gotcher, who had contemporaneous personal access to Piette, did not even address the possibility that Piette contemplated proceeding pro se at sentencing.

Second, even if Piette was attempting to invoke his right to self-representation for purposes of sentencing, he verbally assented to the district court's contrary determination. Specifically, the district court asked Piette whether withdrawing counsel post-sentencing was "acceptable." R. Vol. II at 1108. Piette's "[y]es, sir, yes" response is as notable for what it says as what it does not say. *Id.* at 1109.

39

Between hundreds of pages of letters to the district court and a lengthy statement at sentencing, Piette did not hesitate to share his perspective with the court. The absence of any statement by Piette about self-representation undercuts his claim to clarity on appeal. If Piette wanted to represent himself, he probably would have said something to that effect, especially when given the opportunity.

The district court granted Piette's motion without a *Faretta* hearing not because the court thought it was allowing Piette to proceed pro se, but because it did not view the circumstances as implicating *Faretta*. It reasonably thought Piette wanted new counsel, not self-representation, and Piette said nothing to suggest otherwise. We do not know the contents of the off-the-record conversation between Piette and Gotcher alluded to in the hearing transcript, but if Piette wanted to proceed pro se—a different request from just withdrawing Gotcher—it likely would have come before the court. Piette may be correct that no magic words are required to invoke the right to self-representation, but courts cannot read minds. The clear-and-unequivocal requirement exists in part to "protect . . . the trial court" from a reversal "dilemma" where a defendant granted counsel can assert a violation of the right to proceed pro se, while a defendant granted self-representation can assert a violation of the right to counsel. *Simpson*, 845 F.3d at 1046–47. Here, Piette clearly and unequivocally requested only that his counsel be withdrawn, and the district court granted that request. Because there was no clear and unequivocal request that Gotcher withdraw so that Piette could represent himself at sentencing, and because

40

Piette assented to the district court's contrary ruling, the court did not abuse its discretion.

## VI.

We AFFIRM Piette's traveling-with-intent conviction, REVERSE Piette's kidnapping conviction, reject Piette's constitutional attack on his sentencing, and REMAND for further proceedings consistent with this opinion.